Case No. 14-56596

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

MAVRIX PHOTOGRAPHS LLC,
a California limited liability company,

Plaintiff – Appellant,

*v.*

LIVEJOURNAL, INC.

Defendant – Appellee.

*On Appeal from the U.S. District Court, Central District of California*
*Case No. 8:13-cv-00517-CJC-JPR*

---

## APPELLANT'S OPENING BRIEF

---

Peter R. Afrasiabi (CA Bar No. 193336)
Christopher W. Arledge (CA Bar No. 200767)
John Tehranian (CA Bar No. 211616)
ONE LLP
4000 MacArthur Blvd.
East Tower, Suite 500
Newport Beach, California 92660
Telephone: (949) 502-2870
Facsimile: (949) 258-5081

*Counsel for Appellant Mavrix Photographs LLC*

## <u>FRAP 26.1(a) CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. Proc. 26.1(a), the undersigned counsel for

Plaintiff/Appellant Mavrix Photographs LLC ("Mavrix") states that Mavrix is a

limited liability company with no parent corporation, and no publicly held

corporation owns 10% of its stock.


 Dated:  April 15, 2015                     */s/ Peter R. Afrasiabi*_____
                                            Peter R. Afrasiabi
                                            Christopher W. Arledge
                                            John Tehranian
                                            **ONE LLP**
                                            *Counsel for Plaintiff/Appellant,*
                                            *Mavrix Photographs LLC*

# **TABLE OF CONTENTS**

FRAP 26.1(A) CORPORATE DISCLOSURE STATEMENT ................................1

I.    INTRODUCTION ...............................................................................1

II.   JURISDICTION ................................................................................3

III.  ISSUES ..............................................................................................3

IV.  STATEMENT OF FACTS ................................................................5

   A.   Mavrix's Photography Business and Rampant Infringement.........5

   B.   Monetizing others' content without paying for it...........................7

   C.   LiveJournal's ONTD Business .......................................................8

   D.   Side-note: What is not ONTD's business.......................................8

   E.   How rightsholders' content gets on ONTD....................................9

       1.  The ONTD Rules that set the stage .......................................10

       2.  How a user's proposed submission gets onto the ONTD site................12

           a) Who reviews proposed submissions ..................................12

           b) Standards employed in the review process .........................13

           c) Others' content gets posted on ONTD .................................14

           d) Mavrix's content is infringed .............................................16

   F.   LiveJournal laughs off copyright claims .....................................17

   G.  Proceedings below ........................................................................18

V.    SUMMARY OF ARGUMENT......................................................18

   A.   The "at the direction of the user" provision .................................19

   B.   The "right and ability to control"-"financial benefit" provisions ................19

   C.   The actual/red-flag knowledge provisions ..................................20

VI.  THE DISTRICT COURT ERRED IN DENYING DISCOVERY INTO THE MODERATORS' IDENTITY...................................................................20

   A.   Issue/Standard of Review .............................................................20

B.    The First Amendment and copyright infringement. ......................................21

C.    The Second Circuit ..................................................................24

D.    The district court cites to political speech principles ...................................26

E.    The district court erred in requiring plaintiff to provide notice ...................26

VII.    THE DISTRICT COURT'S SUMMARY JUDGMENT WAS ERROR .....28

A.    DMCA ....................................................................................28

    1.   Purpose ..............................................................................28

    2.   Standards ..........................................................................29

B.    Summary judgment on the "at the direction of the user" prong was wrong ..................................................................................30

    1.   *UMG* does not insulate LiveJournal ..................................................30

    2.   The district court's decision, if followed, creates a circuit split .............39

    3.   LiveJournal's moderators are agents ......................................................40

    4.   Conclusion ..........................................................................44

C.    Summary judgment on the "right and financial ability to control" prong was wrong ..................................................................................45

    1.   Right and ability ..............................................................................45

    2.   Direct financial benefit ......................................................................49

D.    Summary judgment on actual and red-flag knowledge was wrong .............50

    1.   Actual/red-flag knowledge ........................................................51

    2.   Actual knowledge ..............................................................................53

        a)  Actual knowledge exists even with a specificity overlay .................53

        b)  The district court ignored the facts-arguments and got sidetracked on its own-invented issues ..........................................................55

    3.   Red-flag knowledge ..........................................................................56

        a) This Circuit's law requires reversal ..........................................57

        b) *Grokster* ..................................................................................61

    4.   Expeditious removal upon acquiring knowledge ...................................62

3

VIII.  CONCLUSION...................................................................................63

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32..........................65

STATEMENT OF RELATED CASES ....................................................................66

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ..............................................................50

*Arista Records v. Doe*,
   604 F.3d 110 (2d Cir. 2009) ................................................. 24, 25, 27

*AT&T v. Winback & Conserve Program, Inc.*,
   42 F.3d 1421 (3d Cir. 1994) ...............................................................49

*Bleistein v. Donaldson Lithography Co.*,
   188 U.S. 239 (1903)............................................................................49

*Buckley v. Am. Const'l Law Found., Inc.*,
   525 U.S. 182 (1999)............................................................................26

*Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 6355911
   (C.D. Cal. Dec. 21, 2009) ............................................................ 40, 41

*Columbia Pictures Industries, Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ..................................... 3, 40, 45, 48, 49, 52, 59, 60

*Community for Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989)............................................................................41

*Eldred v. Ashcroft*,
   123 S. Ct. 769 (2003)..........................................................................23

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ..................................................... 29, 37

*Fonovisa v. Cherry Auction*,
   76 F.3d 259 (9th Cir. 1996) ...............................................................52

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir.
   1971) ..................................................................................................49

*Golan v. Holder*,
   132 S. Ct. 873 (2012)..........................................................................23

*Grace v. Bradford Exchange*,
    698 F.2d 300 (7th Cir. 1983) .................................................49

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1971)......................................................22

*In re Anonymous Online Speakers*,
    661 F.3d 1168 (9th Cir. 2011) ........................... 21, 22, 23, 25

*In re Capital Cities*,
    918 F.2d 140 (11th Cir. 1990) .............................................23

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
    271 F. Supp. 2d 737 (D. Md. 2003).....................................49

*Malloy v. Fong*,
    37 Cal.2d 356 (1951) .................................................. 41, 42

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995)......................................................26

*MGM Studios, Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)......................................................61

*Osband v. Woodford*,
    290 F.3d 1036 (9th Cir. 2002) ...........................................21

*Paulson v. City of San Diego*,
    523 F.3d 1025 (9th Cir. 2008) ...........................................21

*Perfect 10 v. CC Bill LLC*,
    488 F.3d 1102 (9th Cir. 2007) ..................................... 36, 58

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
    213 F. Supp. 2d 1146, 1163 (C.D. Cal. 2002) ......................45

*Realsongs v. Gulf Broad. Corp.*,
    824 F. Supp. 89 (M.D. La. 1993).......................................49

*S. California Gas Co. v. City of Santa Ana*,
    336 F.3d 885 (9th Cir. 2003) ............................................29

*SaleHoo Grp., Ltd. v. ABC Co.*,
    722 F. Supp. 2d 1210 (W.D. Wash. 2010) .........................................27

*Sony Corp. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)....................................................................51

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
    718 F.3d 1006 (9th Cir. 2013) ....................3, 4, 19, 29, 31, 32, 33, 34, 35, 37, 38,
                                                            44, 45, 46, 48, 50, 51, 52, 57, 62

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ..............................3, 34, 39, 44, 47, 55, 60

*Warner Bros., Inc. v. Lobster Pot, Inc.*,
    582 F. Supp. 478 (N.D. Ohio 1984) ..................................................49

## Statutes

17 U.S.C. § 106 ...............................................................................40

17 U.S.C. § 512(c) ......................................................... 1, 29, 30, 39

17 U.S.C. § 512(c)(1)..................................................... 31, 33, 44

17 U.S.C. § 512(c)(1)(A)(i) .................................................53

17 U.S.C. § 512(c)(1)(A)(i)-(ii) ..........................................50

17 U.S.C. § 512(c)(1)(A)(iii) ..............................................63

17 U.S.C. § 512(c)(1)(B) ............................................. 30, 45

17 U.S.C. § 512(d) .............................................................36

## Other Authorities

CACI 3705 .....................................................................................48

H.R. Rep. No. 105-551(11), at 53.......................................37

H.R.Rep. No. 105–551, at 53 (1998) ................................. 37, 43, 59

*Restatement (Third) of Agency,* § 3.01 (2006).......................47

S. Rep. No. 105-190, at 8 ................................................................. 35, 43

S. Rep. No. 105-190, at 8-9 (1998) ........................................................59

## I.  <u>INTRODUCTION</u>

How far can a business go to control, mold, and curate the type of user-submitted content on its website yet still secure copyright-infringement immunity under the Digital Millennium Copyright Act's (DMCA) affirmative defense of 17 U.S.C. § 512(c)?  Can it—as the district court suggests—take an active role in encouraging third parties to submit particular types of infringing content and then comb through the submissions, picking for display the infringing works it likes best, and still avoid liability?  Because the answer is "no," this Court must reverse.

Defendant LiveJournal, Inc. owns and profits from a celebrity-focused website called www.OhNoTheyDidnt.livejournal.com (ONTD), which website's rules require its users to locate celebrity content from other sources and submit the entirety of other copyright owners' works for potential reproduction on ONTD. Once a user copies content from another source on the internet, the user then offers the content to LiveJournal as a proposed submission for publication.  Critically, the content is not automatically placed on the ONTD site, as in the case of extant DMCA-qualified businesses like YouTube.  Rather, through its W-2 employee and its moderators who operate with official LiveJournal email addresses, all submissions are manually reviewed.  When LiveJournal accepts a user proposal—a decision solely in its discretion based upon whether the content proposal is appealing, timely, desirable, duplicative, and worthy of re-publication in the

1

celebrity-sphere—then LiveJournal will reproduce the content (violating the 17 U.S.C. § 106(1) right to copy) and publish it on the internet (violating the § 106(5) right to public display).

Here, many of Mavrix Photographs LLC's celebrity photos were placed on the ONTD site—even ones with Mavrix's name on them no less—after they were reviewed and accepted for publication by LiveJournal in this discretionary manual selection process. The district court concluded that LiveJournal is entitled to immunity on the theory that the infringement originally began with a third-party user and thus all subsequent infringement was "at the direction of the user." This finds no support in this Court's case law and is contrary to the Second Circuit's case law, all of which law has made clear that genuine hands-off, access-facilitating actions are immune but, reciprocally, when a service provider itself takes manual actions to decide what content to reproduce, its business decisions are its responsibility.

The case also raises a question at the intersection of copyright and the First Amendment: may LiveJournal's moderators remain immune from discovery—despite the fact that they took an active role in selecting infringing works for inclusion on ONTD and are therefore key witnesses here, and despite the fact that they all had earlier entered into contracts with LiveJournal where they agreed they could be subject to discovery—based on some nebulous First Amendment right to

2

anonymity?  The district court held just that in a decision at odds with this Court's case law, the Second Circuit's case law, and common sense.  This Court should reverse.

## II.   <u>JURISDICTION</u>

Jurisdiction exists under 28 U.S.C. § 1291 because the 9/19/14 summary judgment and the 7/22/14 and 6/12/14 discovery orders were appealed on 10/2/14. 3ER431-56.

## III.   <u>ISSUES</u>

1.      Whether LiveJournal's moderators are immune from discovery under the First Amendment where they moderate, enforce, and implement LiveJournal's website's rules that require end users to locate and submit professional content owned by third parties to be uploaded to LiveJournal's website and where they then select which submissions to reproduce and display?

2.      This appeal questions whether summary judgment on LiveJournal's DMCA affirmative defense can stand under *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 718 F.3d 1006 (9th Cir. 2013), *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013)*, and *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 28-29 (2d Cir. 2012):

A.      Whether a service provider who instructs users to upload celebrity content and then picks and chooses among user submissions to decide which

content to publish on its website (thereby impinging on Mavrix's § 106(1)/(5) rights) is entitled to copyright immunity on the theory that the infringement was "at the direction of the user" under § 512(c)(1)? That is, whether the full range of LiveJournal's transactions with the copyrighted content can under *UMG* be deemed merely "access-facilitating" ones?

B.    On the § 512(c) knowledge prongs:

1.    Whether under *UMG* the § 512(c) knowledge prongs require a showing of actual or red-flag knowledge as to the specific infringements of Mavrix's work where ONTD is not simply a neutral mechanism capable of both infringing and non-infringing uses but is, instead, designed to be and operated as a mass-infringement machine for profit?

2.    Even if knowledge of specific infringements is required, do genuine fact issues exist as to LiveJournal's actual knowledge in light of the fact that Mavrix's W-2 employee reviews every piece of content posted, 84% of the content is unlicensed and infringing, and some of Mavrix's photos even had Mavrix's name on them?

3.    Even if knowledge of specific infringements is required, do genuine fact issues exist as to whether LiveJournal had red-flag knowledge because its rules require users to locate others' content and submit it *in toto* including the identity of the true owner; where 84% of the content on the site is

4

unlicensed and infringing; where some of Mavrix's photographs even had

Mavrix's name written on them; and where LiveJournal had notice that, because of

ONTD's rules and procedures, users believed they were permitted under copyright

law to copy entire articles from third parties as long as they provided the source,

something LiveJournal knew was flat wrong?

C.     Whether LiveJournal has the right and ability to control the infringing

activity where it set the rules for what content is allowed on the site and had a W-2

employee who himself selected content for inclusion and also supervised others'

efforts in that regard, and where LiveJournal has a direct financial benefit

attributable to the infringement due to its receipt of money tied solely to the

unlicensed content it monetizes through advertising revenue?

## IV.     STATEMENT OF FACTS

### A.     Mavrix's Photography Business and Rampant Infringement

Mavrix owns the copyrights to celebrity photos, which photos Mavrix (and

its sister company Mavrix Photo, Inc.) secure at great cost and through enterprise.

These celebrity photos are captured and owned by Mavrix, and license for

significant sums of money to myriad news outlets interested in publishing celebrity

content.  Mavrix's clients include massive outlets such as *People* and *US Weekly*.

5ER730-33¶2-5.

But Mavrix's business model is under assault from rampant internet infringement, which infringement is particularly centered around Defendant's website. *Id.* ¶8. When Mavrix secures valuable exclusive photos of celebrities, often before it can even monetize the photos, those photos are stolen and leaked to the internet, which in turn eliminates the full value Mavrix can secure by license deals with its clients. *Id.* ¶3-4. Simply put, *People*, *US Weekly*, and other celebrity-based publications cannot and will not pay a significant amount of money to license photographs when the works will be available (via theft) all over the internet for free. Even if Mavrix could contact each and every infringer – and that would take time and resources that Mavrix simply does not have – and even if Mavrix could convince all of the infringers to remove the photographs from their websites, the pictures will already have been published and seen by the public, and they will no longer retain their original value. *Id.*

This mass infringement is, practically speaking, inescapable as infringers are always able to get their hands on popular photographs. Indeed, one of LiveJournal's own websites is an illicit trading bazaar where passwords are traded so as to hack celebrity photos companies like Mavrix, steal the photos, and reproduce them across varied internet sites. 5ER731¶4; 734-45 (Exh. A).

6

## B.    Monetizing others' content without paying for it

The most basic question confronting any website that wants to secure advertising revenue from eyeballs viewing massive amounts of quality celebrity content on its servers (impacting the § 106(1) reproduction right of copyright owners) for the public to view (impacting the § 106(5) public display right) is how to get that content on the website in a copyright-safe manner as cheaply as possible.  One way is to license content from the content owners, such as Mavrix and Mavrix licensees (such as end magazines).  That's expensive.  LiveJournal chooses not to do that.  7ER1247:12-1249:9; 6ER947¶9.

This case thus deals with the other way: open a website and pray the citizenry puts others' popular content on your site, make advertising money from that fresh, popular content because the content draws viewers, but (pretend to) distance yourself from the acts of infringement required to get copyright-owners' content on the site by hiding behind the DMCA and claiming the uploads are user-generated, not business-generated, and by claiming no knowledge and control or financial benefit.  Or, when prayers alone fail to get others to upload valuable content, take steps to facilitate the citizenry's illegal acts so as to monetize the visits to the site.  That is this case.

### C.    LiveJournal's ONTD Business

LiveJournal owns and profits (itself alone) from one of its many websites known as "Oh No They Didn't!" or for short "ONTD," an English language publicly-viewable website (located at: www.ohnotheydidnt.livejournal.com, 12ER2331#26) devoted exclusively to American celebrity culture. 5ER829¶7; 6ER945-48 & 1000-1110 (analyzing ONTD celebrity content on submission-by-submission basis); 16ER3196. The ONTD website has 99,000 users/members. 8ER1428¶17. LiveJournal makes money from the ONTD website due to advertising content. 5ER756:9-757:17; 16ER3196. Specifically, advertisers pay money to have their ads put on the ONTD website because there are many eyeballs on the site every day. 7ER1238:5-17; 7ER1154:17-1155:3; 7ER1299:13-20; 7ER1308; 7ER1362#45-46.

Eyeballs go the site because of the site's quality celebrity content. 7ER1308, 1311. Celebrity content is valuable content because of the public's fascination, indeed obsession, with celebrities and celebrity culture. 5ER731¶2; 5ER829:11-12; 4ER727#220. There are on average 100-120 new posts every day. 8ER1428¶18, 8ER1482¶6.

### D.    Side-note: What is not ONTD's business

While LiveJournal is a California corporation, it is owned by Russian citizens. 12ER2392#237. Part of the problem with this case below is the fact that

the district court appears to have believed that Russian-owned LiveJournal was

providing help to the poor Russian citizenry who are denied access to the press by

their government. 1ER21:2-10. It is not clear why the district court believed that

***ONTD*** serves any such interest; it is unclear, really, how this non-Cyrillic, English-

language celebrity website has anything to do with freeing the poor Russian

citizenry from the shackles of whatever the district court believes shackles them.

The record is absent any evidence to support the district court's apparent concern

for bringing free speech to Russia.

Whatever other websites LiveJournal may operate that in fact help the

Russian citizenry is not even in this record (and totally irrelevant—Mavrix may

have donated to charity too, but so what?), and no other LiveJournal website

beyond ONTD—out of the millions it allegedly operates (12ER2329#15-16,

2342#72)—is even at issue in this case, save the one LiveJournal website

mentioned above that operates as a trading bazaar for the exchange of passwords to

facilitate the hacking of Mavrix's and other businesses' computers (5ER734-45,

Exh. A).

### E. How rightsholders' content gets on ONTD

The exact process for how content gets on ONTD is critical to this case.

### 1.     The ONTD Rules that set the stage

First, LiveJournal's ONTD site has specific rules that the users of the site—people who have a LiveJournal account and are users of the ONTD website—must follow in order to submit proposed content for posting.  That is, unlike the case of YouTube where anyone can upload any (legal and non-pornographic) material they want, the massive world of internet surfers cannot just submit anything to the ONTD site and have that content be reproduced and publicly posted.  7ER1142:11-1143:5 (users propose submission into a queue for ONTD employee-moderator to review); 7ER1146:1-1147:16 (no publication to world upon submission); 7ER1130:12-17 (employee or moderators accept or reject proposals for publication).  Indeed, ONTD users cannot post *anything* to the website.  Rather, ONTD users merely send submissions as proposals for ONTD to consider, and ONTD's employee and moderators-maintainers then make the decision whether to reproduce and display the content.  *Id.*

To be selected, a submission must satisfy ONTD's content-based rules.  First, submissions must be celebrity-based.  7ER1114-17, 7ER 1174:21-1181:6, 7ER1149:18-25.  Proposed submissions not "relevant" to ONTD are also rejected.  7ER1178:20-25.  Thus, political content or other news stories are not permitted.  7ER1179:10-17, 7ER1116.  Also, a submission that repeats a celebrity topic already posted is also rejected, 7ER1115, 8ER1483¶10, because they make the

10

ONTD site less appealing.  7ER1166:18-1168:25.  Additionally, a submission must also be timely in relation to the celebrity story.  7ER1116, 7ER1171:25-1172:24.

Second, for a submission to be considered for display, it must be copied from an approved source.  7ER1114-17, 1202:10-1203:16.  LiveJournal wants reputable sources for the material because otherwise the user could have just made up the content rendering the content "disinformation."  7ER1202:10-1203:16, 1206:7-24.  As such, the ONTD Rules require that the "source"—a euphemism of course for "true owner/author/creator"—be given by the user when the offering is made.  *Id.*  This helps ONTD know that the celebrity content it is assessing is valuable content that users will want to read and view in distinction to, say, Joe Q. Public's irrelevant, random musings about a given celebrity, 7ER1202:10-1203:16, and that the information is likely accurate.  *Id.*  Thus, ONTD moderators reject submissions that do not include a known "source."  16ER3396-3401.

Third, while the vast majority of the content on ONTD comes from reputable third-party sources, users are not permitted merely to point out that a third party has an article, pictures, or other information worth viewing.  Nor can users comment on a third party's content and offer their opinions on it with a link to the third party.  No, the ONTD Rules mandate that instead of supplying a link to that content (which would send viewers outside the ONTD site and hence lose eyeballs and lose the ad revenue), users must ***copy*** content that belongs to the third

11

parties *in toto*—the celebrity photos taken by companies like Mavrix and the articles written about those celebrities by other authors—and submit the entirety of others' content to ONTD for ONTD's consideration for hosting and public display-posting:

> "Don't be lazy with your posts. ***Include the article and picture(s) in your post***, do not simply refer us to another site for the goods."

7ER1116 (emphasis added).

### 2. How a user's proposed submission gets onto the ONTD site

#### a) Who reviews proposed submissions

LiveJournal of course owns the ONTD site. 5ER767:18-768:2; 7ER1197:15-1199:5 (LiveJournal's denoted owner is called "Pinky"); 16ER3196. Once a user submits proposed content for ONTD's consideration, a LiveJournal W-2 employee named Brenden Delzer, official "Editor" of ONTD, reviews the submission, or a moderator or maintainer who works under his direction does so. 7ER1133:20-1134:17; 7ER1129:14-1130:22; 16ER3385-3427 *specifically at* 3420-23,3402-03,3418-19, 3416-17,3414-15,3407-09,3404-06,3424-25 (Delzer communications). The ONTD website has "moderators" and "maintainers" who enforce the rules stated above and assess and approve or reject user submissions. 7ER1133:20-1134:17; 7ER1149:18-25; 8ER1483¶9-10. Both moderators and maintainers approve or reject proposed submissions; maintainers can also delete users or delete already-approved posts. 7ER1133:20-1134:17. Ultimately,

12

LiveJournal as the owner of ONTD has complete authority over who moderates the ONTD rules. 7ER1252:14-1253:13, 7ER1257:9-1259:3, 7ER1124.

Editor Delzer is the only W-2 employee who serves as a moderator and maintainer. 17ER3468; 7ER1358#10. He was hired in 2010 and before that was also a moderator-maintainer. 8ER1481¶2. The other moderators-maintainers also have livejournal.com email addresses, 5ER778-789, and they answer to Delzer. 7ER1358#12-13. Editor Delzer is the "head maintainer" with an "elevated status" compared to other moderators. 7ER1272:17-1273:16. Delzer himself spends an hour and a half per day reviewing and approving submissions. 7ER1147:24-1148:3. He is also on the site all day every day checking the site:

> "I live and breathe ONTD. The first thing I do in the morning when I wake up is check ONTD. In the office it's ONTD all day, and the last thing I do before I go to sleep is check ONTD."

7ER1121; 7ER1212-15 (confirming accuracy of quote).

### b) Standards employed in the review process

Again, a user cannot publish anything on ONTD. A user can simply submit a proposal, much the way someone can submit a letter to the editor of a newspaper. And just as a newspaper's editorial staff combs through submissions to determine what should be published, Delzer and his moderators manually review every offering and decide what to publish using the above criteria. *Supra* § E.2.a; 7ER1121 (up to 300 submissions per day). While moderators and maintainers

13

have some discretion in how they apply the ONTD rules, their job is to apply the ONTD rules that Delzer and LiveJournal control. This includes, of course, the requirement of a known, reputable source and a complete copy of the third party's material. *Supra* § E.1.

Indeed, in implementing that rule, ONTD's moderators and maintainers sometimes reject proposed content because it has copied only a portion, rather than all, of a third party's material. 17ER3465, 16ER3460. Further, Delzer faults moderators who failed to carry out their duties properly: he criticized moderators for accepting submissions without the "source" and has ordered them to insure the "source" is stated for the viewing public. 16ER3424. Likewise, he ordered moderators to reject offerings from certain sites because those third party sites were "dumb." 16ER3418. In this manner, Delzer and the moderators curate ONTD in a manner they desire.

Moreover, Delzer himself can see whether moderators are doing their jobs correctly since he is quite literally on the ONTD site reviewing it all day, every day. 7ER1121. Every piece of content on the site is something that Delzer himself eventually reviews. 7ER1120-22, 7ER1215:5-20, 7ER1276.

### c) Others' content gets posted on ONTD

Upon Delzer/moderators' exercise of discretion, a submission is accepted and then loaded onto the ONTD site for public display for the whole world to see.

14

7ER1130, 1146:1-1147:16. The result of this entire process is about 100-120 posts daily. 8ER1428¶18, 8ER1482¶6.

Remarkably, the undisputed facts below showed that 84% of those published posts are unlicensed, infringing thefts of others' material (Mavrix's included). 6ER944-48 (with Exhibits). Specifically, a statistically relevant and random (4ER508-12) sample pool of content posted on the ONTD site was analyzed (6ER944-48¶6-10) and yielded the following:

● Of 912 posts, 767 contained celebrity photos and articles wholesale lifted from reputable, known third party owners (*Daily Mail*, *Huffington*, *Getty*, *E!*, *People*, etc.), none of which purported to be owned by the user who submitted the posts for ONTD's consideration. 6ER947¶8. Thus, 84% (767/912) are all unlicensed, infringing posts. *Id.*

● Of 912 posts, only 9 were actual user blog posts whereby the user submitted his or her own blog post. 6ER948¶11.

Indeed, the 84% number is low, because Mavrix's expert analysis below treated the remaining 145 posts (912 less the 767 and less the 9) as non-infringing even though they were lifted wholesale from Twitter/Facebook/YouTube. 6ER948¶10.

#### d) Mavrix's content is infringed

Mavrix sued based upon the infringement of 38 of its photographs. 15ER3073. Eleven had (non-Mavrix specific) watermarks on them. 15ER3107-16. Then, after the suit was filed, ONTD reproduced and publicly displayed two more photos, ones that had Mavrix's actual name written beneath them. 5ER894-95. Those photos were added to the action, which now involves 40 photos. 5ER827-97.

Delzer and LiveJournal admit that historically they never kept records of which moderator approved which submissions. 5ER773:15-775:10. After this lawsuit, they started keeping such records (demonstrating it is technically possible). *Id.* While Delzer ultimately reviews every published post that goes up every day (7ER1120-22, 7ER1215:5-20, 7ER1276) and personally spends hours each day reviewing and approving submissions (7ER1147:24-1148:3), he claims that to the best of his memory he does not know who exactly approved the submissions of Mavrix's photos for public reproduction and publication and to the best of his recollection he does not know if he did. 8ER1486.

Regardless of his deficient memory, Delzer wholeheartedly believes that the re-publication and theft of others' content on ONTD actually benefits the true owner. 7ER1156:7-1157:2.

16

### F.    LiveJournal laughs off copyright claims

Not surprisingly, LiveJournal has received complaints from third parties such as *Time Magazine* among others about its practice of reproducing entire articles/photos/content.  16ER3387-88.

And when LiveJournal has removed stolen content from its ONTD site after complaints, LiveJournal's users have complained that they followed the express rules that require submitting the **whole** article and so are confused why their previously-accepted-and-posted submissions were removed.  16ER3438, 3442. LiveJournal literally laughs at such questions, mocking the users for not understanding that their posts are obvious copyright infringement: "***lol, sweetheart, putting [source] at the end does not let you steal an entire multipage article and all the images.  No honey, it doesn't work that way***."  16ER3435 (emphasis added).  Put simply, LiveJournal knows its rules require the citizenry to infringe.

Delzer did consider changing the ONTD rule to require less of others' articles/content be copied.  But he concluded it would be "more trouble than it's worth."  Why?  It would be disappointing to limit the amount of content (illegally) copied from the third parties.  16ER9075-76.

And the coup de grâce: Delzer himself has even told users who have engaged in copyright infringement (at the suggestion of his own rules no less) not to worry about it: "Don't worry, you won't be sued…they're [the true owner who

complained] probably possessive of that particular entry, if it's timely."
16ER3431.

### G.    Proceedings below

Mavrix sought the identity of the moderators.  13ER2433-61 (deposition); 13ER2638-83 (interrogatories).  Mavrix was denied discovery due to a combination of an alleged First Amendment anonymity right and because Mavrix did not provide notice to the unknown, anonymous moderators.  1ER63.  Thus, Mavrix never deposed them.  14ER2768:19-2679:5, 13ER2638-83.

The parties cross-moved for summary judgment on LiveJournal's DMCA affirmative defense, and the court granted summary judgment to LiveJournal. 1ER43-60.

## V.    <u>SUMMARY OF ARGUMENT</u>

First, denying access to LiveJournal's anonymous moderators was wrong. The moderators have no First Amendment anonymity right.  Even if some sort of right exists, discovery demands trump that right where the moderators all agreed contractually with LiveJournal that they could be unmasked in a lawsuit, meaning they had no real expectation of anonymity-privacy anyway.  And it was error to require Mavrix to provide them notice, when only LiveJournal knows their identities.

18

Second, the district court's § 512(c) summary judgment rested on three grounds.

## A.    The "at the direction of the user" provision

Immunity exists under § 512(c) when the infringement occurs "by reason of the storage at the direction of the user."  Where a service provider with its employees or its agent-moderators picks and chooses among user submissions as to which submissions it will publish, the infringement is not at the direction of the user.  Those acts of infringement—the actual selection among various content offerings of which ones to reproduce and publicly display—are not "access-facilitating" acts (or akin to electronic storage acts) within *UMG*.  Instead, those active content-curation and editorial steps exist at the direction of the service provider, and are decidedly not user-directed acts.

## B.    The "right and ability to control"-"financial benefit" provisions

LiveJournal has the right and ability to control its ONTD site because its rules require the posting of the entirety of others' content, require certain kinds of content to be submitted if to be accepted, and employee/agent-moderators sift the submissions to decide which content best develops the ONTD site.  LiveJournal encourages the citizenry to infringe others' works—particular works: timely celebrity content from sourced websites—and monetizes those infringements by deciding which offered infringements it wants to further infringe by hosting for

19

public display. Also, LiveJournal has a direct financial benefit because it makes money solely from viewers looking at the content by way of advertising revenues, which is the draw for the site's viewers.

### C. The actual/red-flag knowledge provisions

Actual and red-flag knowledge exist because LiveJournal's operating rule requires people to copy others' works. LiveJournal even requires the true owner/author to be noted with a user's submission. LiveJournal licenses no content. It accepts over a hundred submissions a day out of more proposals. The undisputed evidence showed that at least 84% of the content is infringing. LiveJournal's Editor employee spends all day every day reviewing the ONTD site's content. Some of Mavrix's photos even had Mavrix's name on them; others had watermarks. At a minimum, genuine fact issues as to actual/red-flag knowledge exist.

## VI. <u>THE DISTRICT COURT ERRED IN DENYING DISCOVERY INTO THE MODERATORS' IDENTITY</u>

### A. Issue/Standard of Review

Whether the material on ONTD is user-uploaded – that is, the result of non-LiveJournal sources rather than LiveJournal itself – is obviously an important question in this case. To help establish that the moderators are agents of LiveJournal who answer to Delzer, Mavrix sought the moderators' names/contact

information to depose them.  The district court denied access to the moderators.

1ER63.

Although discovery disputes are reviewed for an abuse of discretion, *see*

*Paulson v. City of San Diego*, 523 F.3d 1025, 1031 (9th Cir. 2008), questions of law

are reviewed de novo, *Osband v. Woodford,* 290 F.3d 1036, 1041 (9th Cir. 2002).

Here, the question is one of law, involves nothing that traditionally invokes

deference to the trial court, and, in any event, was an abuse of discretion/clear error

given the wrong legal framework applied.

### B.     The First Amendment and copyright infringement.

The basic question is whether an anonymous internet user possesses a First

Amendment anonymity right to remain impervious to discovery when the user is

involved in copyright infringement activities and where the user contractually

agreed with the website that in the event of discovery he or she would be

unmasked.  Here, the district court apparently found a First Amendment anonymity

right, and required plaintiff to first contact the unknown third parties to provide

notice to them.  1ER63.  It erred.

Two legal principles, when mated together, answer this issue.  First,

although this Court has not addressed the precise issue of copyright-discovery and

First Amendment anonymity rights, its extant case law amply illuminates the path.

In *In re Anonymous Online Speakers*, 661 F.3d 1168 (9th Cir. 2011), plaintiff

21

asked the defendant to identify five anonymous speakers who allegedly posted

defamatory comments. *Id*. at 1171. To decide this discovery question, the district

court used a heightened standard—essentially would the plaintiff be able to prove a

summary judgment?—and given the plaintiff's showing ordered the anonymous

person to be identified. *Id.* at 1172.

The fundamental question as to which discovery standard applies—

heightened or less exacting—turns on the "nature of the speech." *Id*. at 1177.

"The right to speak, whether anonymously or otherwise, is not unlimited, however,

and the degree of scrutiny varies depending on the circumstances and the type of

speech at issue." *Id.* at 1173. The Court held that the district court's use of a

heightened standard for political speech, where the case at issue involved

commercial speech, was "given the decision to disclose" not clear error within

mandamus review. *Id*. That is, the decision was improper—anonymous

commercial speech is not subject to a heightened test—yet harmless given the

outcome that required disclosure anyway.

The second principle is that the First Amendment doesn't protect copyright

infringement. The Supreme Court has held that the First Amendment offers no

blanket defense to a charge of copyright infringement. *See Harper & Row*

*Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 568 (1971) (taking even for

public, political purposes still infringement within fair use rubric). As the Eleventh

22

Circuit held, "the First Amendment is not a license to trammel on legally recognized rights in intellectual property." *In re Capital Cities*, 918 F.2d 140, 143 (11th Cir. 1990). Copyright law itself, both on the scope of infringement and the scope of the fair use defense, balances all First Amendment issues. *See, e.g.*, *Golan v. Holder,* 132 S. Ct. 873, 890 (2012); *Eldred v. Ashcroft*, 123 S. Ct. 769, 789 (2003) ("The First Amendment securely protects the freedom to make—or decline to make—one's own speech; it bears less heavily when speakers assert the right to make other people's speeches.").

When these two principles are joined, the answer is clear. Here, the issue involves copyright infringement, and copyright infringement is outside the First Amendment. That is, the outright theft of Mavrix's photos in their entirety for commercial purposes, and the decision to reproduce and publish them, is copyright infringement with no fair use defense and hence outside the First Amendment. Under *In re Anonymous*, if commercial speech was not entitled to anonymity from discovery, then the discovery here is all the more immune to any asserted First Amendment defense. Even under a heightened test, Mavrix was entitled to the discovery: the moderators sift among submissions—all sourced to true owners and which submissions are copied *in toto* under the very rules being moderated—and choose what content to reproduce/publicly post. That is copyright infringement, both direct and secondary. 14ER2819-20 (explaining legal basis and cases).

23

Finally, this case is remarkable in that LiveJournal, having argued vigorously that the First Amendment denied Mavrix the right to know who the moderators were, eventually turned around and argued that Mavrix was allowed the information all along. Specifically, at the case's conclusion, LiveJournal sought fees and in its zeal to charge improper litigation conduct against Mavrix, it argued that Mavrix wasted time with motions to compel moderator identity information, when all it had to do was serve a § 512 subpoena (in lieu of its FRCP request). 3ER245:21-25. That is, LiveJournal conceded Mavrix was always entitled to the moderators' identities notwithstanding the First Amendment, which if applicable trumps § 512 as much as the FRCP.

### C. The Second Circuit

The Second Circuit has assessed this question in the copyright context. Its conclusion: discovery must proceed. In *Arista Records v. Doe*, 604 F.3d 110, 112 (2d Cir. 2009), plaintiff sought the identity of infringers. It served a subpoena on the Internet Service Provider (ISP), the ISP notified the underlying user, and the user asserted the First Amendment. The court treated the copyright acts as speech-like and settled on a 5-part test: (1) a concrete showing of plaintiff's prima facie case; (2) specificity of the discovery; (3) availability of alternate means; (4) the need for the information; and (5) privacy expectation. *Id.* at 119.

24

Applied, the court held that "to the extent that anonymity is used to mask copyright infringement or to facilitate such infringement by other persons, it is unprotected by the First Amendment." *Id.* at 118. There is simply no right to hide "behind a shield of anonymity." *Id.* at 124.

Mavrix does not even believe the *Arista* multi-factor test is proper because *Arista* assumes that copyright infringement is on the low end of the First Amendment speech/expression spectrum. That proposition is at odds with the Supreme Court's treatment of copyright infringement activities as discussed above and applied here. Properly understood, then, there is no First Amendment right to engage in anonymous copyright infringement, and so no limit on discovery was appropriate.

But even if this Court agrees with *Arista* that copyright infringement is speech-like, it is most certainly at the low(est) end of the speech-expression spectrum. At best, the actual selection of what to steal may be deemed expressive—the posting of these Mavrix photos of Katy Perry or Beyoncé because Delzer or the moderator particularly liked those specific ones theoretically shows some expressive act occurring with the theft—but it is just barely in the zone of speech/expression, if at all.

Thus, under *Arista* and *In re Anonymous* the discovery should certainly flow, because here LiveJournal's moderators even contractually agreed to discovery,

25

thereby waiving any expectation of anonymity-privacy. 13ER2681 ("Legal Process"). The moderators actually decide to and in fact do upload the photos, thus their identity as actual participants in infringement and/or agents of LiveJournal is important. 17ER1142:11-1143:5, 7ER1146:1-1147:17, 7ER1130:12-17. Also, there were no alternate means to find them because they were anonymous parties contracted to LiveJournal. 13ER2638-83.

### D. The district court cites to political speech principles

The district court erred when it cited *Buckley v. Am. Const'l Law Found., Inc.*, 525 U.S. 182, 199 (1999), a case which deals with First Amendment anonymity rights in the political speech context. 1ER63. No doubt, in political speech cases, there is a heightened concern for anonymity. *See, e.g.*, *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 343 (1995) (importance of anonymous political speech at Republic's founding). But this is a copyright infringement case, and has nothing to do with anonymous political speech.

### E. The district court erred in requiring plaintiff to provide notice

The district court held that the ***plaintiff*** should have given some form of notice to the moderators. 1ER63. This was error.

The law does not require the plaintiff to provide "notice" to the anonymous person privately contracted to the defendant—itself a near oxymoronic requirement given the circumstances. The only case offered to purportedly justify such a

26

radical requirement was *SaleHoo Grp., Ltd. v. ABC Co.,* 722 F. Supp. 2d 1210, 1212 (W.D. Wash. 2010).

A defamation case, *SaleHoo* involved actual speech, not copyright infringement. There, the Doe defendant had a website called www.SalehooSucks.com offering beliefs that SaleHoo's services were a scam. *Id.* at 1212-13. Plaintiff served a subpoena on the ISP and the Doe defendant was notified by the ISP and objected. The court noted that plaintiff has to provide notice to let the Doe defendant participate. *Id.* at 1215. There, the party with the relationship with the Doe, the ISP, forwarded the subpoena. Here, LiveJournal has a contractual relationship with its moderators, yet the district court did not require it to deliver any notice. In turn, Mavrix was denied access to the most basic information—contact information—so that it could serve notice. Regardless, *SaleHoo* does not justify this court adopting a plaintiff-centric notice requirement.

Moreover, *Arista* did not require a plaintiff to provide such notice. Rather, the district court ordered the third-party ISP—the one with the contractual relationship—to give notice, which the court affirmed. 604 F.3d at 113. No good reason exists to create a circuit split here.

But if notice is important because there is a real First Amendment right at issue, then courts should act as if notice is important: tell the party who has contracted with and knows the anonymous users to serve notice—here, that is only

27

LiveJournal (14ER2702-03). Dumping the burden on Mavrix with the procedural pretzel employed below makes a mockery of the idea that notice even matters.

Finally, if a plaintiff-centric notice requirement exists, here it was met. First, when Mavrix earlier emailed the moderators, no one responded and most were bounced. 13ER2430:3-2431:10. Second, and critically, when Mavrix's lawyers emailed the moderators, LiveJournal's lawyers—from one of the largest law firms in the world—levied *ethics* charges for making contact. 14ER2941:23-24; 13ER2431:11-2432:14, 13ER2467:14-2468:20. Mavrix was put between the Scylla of contacting the moderators and receiving a State Bar ethics charge/lawsuit or the Charybdis of avoiding ethics violations and not contacting them. Even if this Court adopts a plaintiff-centric notice requirement, as a matter of law here such a requirement could not be imposed and/or was excused.

This Court should reverse and remand.

## VII. THE DISTRICT COURT'S SUMMARY JUDGMENT WAS ERROR

### A. DMCA

#### 1. Purpose

Congress adopted the DMCA to protect passive providers of storage because the very nature of computerized businesses could lead to direct infringement liability that would not arise from comparable conduct in the offline world. *See* S. Rep. No. 105-190, at 8 ("In the ordinary course of their operations service

28

providers must engage in all kinds of acts that expose them to potential copyright infringement liability…service providers must make ... electronic copies ... in order to host World Wide Web sites").  But Congress did not intend to give content-based entertainment enterprises an unfair advantage over traditional media merely because they operate on the Internet.  As this Court cautioned about another limited Internet immunity, the Internet's "vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1164 n.15 (9th Cir. 2008) (en banc).

### 2. Standards

LiveJournal bears the burden of proof on its affirmative defense, *UMG*, 718 F.3d at 1013-14, which requires it to establish "beyond controversy every essential element." *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).  This Court reviews *de novo*.  *UMG*, 718 F.3d at 1014.

To secure the § 512(c) safe harbor, LiveJournal must establish all of the following:

(1)  It is a "service provider" (§ 512(c)); and

(2)     The copyright infringement is "by reason of the storage at the direction of
        the user of material that resides on  a system or network" (§ 512(c)); and

(3)     Either it lacks actual and red flag knowledge of infringement or upon
        gaining such knowledge it expeditiously removed infringing material.  (§
        512(c)(1)(A)(i)-(iii)); and

(4)     It does not receive a financial benefit directly attributable to the infringing
        activity where it has the right and ability to control (§ 512(c)(1)(B)); and

(5)     In the case of receipt of formal take down notifications of infringement, it
        expeditiously removes (§ 512(c)(1)(C) & (3)); and

(6)     It has a designated agent (§ 512(c)(2)); and

(7)     It has a reasonable repeat-infringer termination policy (§ 512(i)).

The second, third and fourth elements were the basis for the summary

judgment.  1ER51-58.

**B.     Summary judgment on the "at the direction of the user" prong
        was wrong**

The district court concluded that the infringement was by reason of storage

at the direction of the user.  1ER52.  This is wrong.

**1.     *UMG* does not insulate LiveJournal**

Section 512(c)(1) states that a service provider is not liable "for infringement

of copyright by reason of the storage at the direction of a user of material that

resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1). Legislative history confirms that a service provider offers "storage" services when it provides "server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users." H.R. Rep. No. 105-551(11), at 53. But the text and structure of the DMCA make just as clear that § 512(c)'s at-the-direction-of-the-user language does not include material "that resides on the system or network operated by or for the service provider ***through its own acts or decisions*** and not at the direction of a user." H.R.Rep. No. 105–551, at 53 (1998) (emphasis added).

The question here is one of first impression in this Circuit, specifically whether, given LiveJournal's involvement in the content curation on its ONTD site, the infringement occurs by reason of the storage of material at the direction of the user or whether really it occurs because of LiveJournal's own content-involved acts/decisions.

The only case in this Circuit assessing this language's meaning is *UMG*. There, Veoh operated a website that allowed users to upload content for viewing (like YouTube). Specifically: (1) Veoh's system was simply "a system whereby software ***automatically processes*** user-submitted content and recasts it in a format that is readily accessible to its users," *id*. at 1020 (emphasis added); (2) Veoh ***did not*** actively participate in or supervise file uploading, *id*.; and (3) Veoh did not

31

"preview or select the files before the upload is completed." *Id*. The only question was whether "the functions ***automatically performed by Veoh's*** software when a user uploads a video" fell within § 512(c)(1). *Id*. at 1015-16 (emphasis added). UMG argued that § 512(c)(1) was only intended to protect web hosting services and that a company that performs functions beyond simply hosting is no longer able to claim the infringement was "at the direction of the user." *Id.* at 1019.

The Court rejected UMG's argument and concluded that § 512(c)(1) encompasses "the access-facilitating processes that automatically occur when a user uploads a video to Veoh." *Id.* at 1016. In particular, the Court noted that § 512(c) presupposed that service providers would provide access to user's uploads, which access-facilitating acts resulted in copying content to enable users to view what they uploaded. *Id.* at 1018 ("web hosting services require those service providers to make, transmit, and download multiple copies of users' stored material."). That is, the language covered more than a mere electronic storage locker. *Id.* at 1016. Thus, Veoh's automated software process—loading the user video into a viewable format where ***Veoh did not actively participate in file uploading or preview files before posting***, *id.* at 1020—did not alone justify losing the safe harbor because then every web-hosting company would necessarily lose the safe harbor. *Id.* at 1017-18.

32

Accordingly, this Court rejected the argument before it—namely that the DMCA only protected traditional web hosting companies—and held that a service provider's automated access-facilitating processes did not alone mean the infringement is not user directed. *Id.* at 1018. "We cannot see how these access-facilitating processes are meaningfully distinguishable from Veoh's for § 512(c)(1) purposes." *Id.* That is, Veoh's acts were really no different to traditional web hosts—an automated process made uploaded content viewable. *Id.*

But Mavrix is not arguing to the contrary and the district court's snap citation to *UMG* does not answer the question posed by these very different facts. Here, the district court simply asserted that § 512(c)(1) covers more than a mere electronic storage locker. 1ER52:1-3. True. But the question is how much more? The district court did not grapple with that question and instead said that LiveJournal was immune because the statute reaches beyond mere electronic storage lockers. 1ER52:1-10.

The proper question posed here is how far beyond electronic-storage-locker activity or access-facilitating conduct can a service provider go before it falls outside the safe harbor? And the answer is that *UMG* does not help LiveJournal; rather, *UMG* condemns it because LiveJournal, unlike Veoh, is actively involved in previewing and selecting the content and not simply running an automated upload-and-publicly-post system.

33

First, LiveJournal asks by way of a rule for users to upload others' content (something Veoh never did). 7ER1116. That alone means the service provider is curating the very content that appears on its site and is itself initially directing the substantive nature of the user submissions. And that alone should mean the infringement is not truly user-directed under *UMG* because LiveJournal is not simply taking unexpected, unknown content from users, the touchstone for immunity in *UMG*, 718 F.3d at 1020 (simply "a system whereby software automatically processes user-submitted content and recasts it in a format that is readily accessible to its users."). Rather, LiveJournal is by its own acts/decisions curating ONTD's content. Indeed, Veoh never told users what kind of content to upload, instead accepting anything-everything no matter the substantive nature and no matter how silly (except illegal content of course). *See UMG*, 718 at 1011-12 (users upload any kind of videos, except illegal content); *see also YouTube, Inc.*, 676 F.3d at 19, 28-29 (same).

Second, LiveJournal sifts the user offerings (Veoh did not do that), has a paid W-2 employee look at every post (something Veoh did not do), has moderators who enforce the rules and do their work with livejournal.com email addresses (something Veoh did not do), and ultimately the moderators-maintainers directed by Editor Delzer manually review the user-offered submissions to select which ones LiveJournal—not the user—wants to post to the world (something

Veoh did not do either). *Supra* § IV.E. Thus, entirely unlike Veoh, LiveJournal is actively participating in the file upload process by directing what kind of content to upload with its rules. *See UMG*, 718 F.3d at 1020 (Veoh did not actively participate in/supervise file uploading hence acts were user-directed). Furthermore, Veoh escaped liability because it did not "preview or select the files before the upload is completed," *id.*, but LiveJournal has tripped that wire and does exactly that kind of review-analysis to decide what content to reproduce. 7ER1142:11-1143:5, 7ER1146:1-1147:17, 7ER1130:12-17.

Third, there is an important distinction between the roles of the user and service provider vis-à-vis the copyright infringement that is present in this case, a distinction not present in prior case law. Specifically, the direction-storage function is the litmus test, but LiveJournal users in fact don't direct the storage of anything. Instead, users offer submissions for consideration, but LiveJournal itself picks which ones it wants to store and publicize to the world. *Id.* The user thus has directed no storage at all, indeed the user has no right to even store his or her content on ONTD because all content storage-upload decisions are made solely by human discretion on the part of LiveJournal, which accepts a subset of proposals, *see* 7ER1121 (300 daily proposals), 8ER1428¶18, 8ER1482¶6 (100-120 accepted). Because the user in fact stores nothing and has no ability to direct the storage of anything, the predicate § 512(c)(1) language is not even triggered. Thus,

35

LiveJournal does not even provide users an electronic storage locker, because only LiveJournal has the locker combination. 7ER1146:1-1147:16.

Moreover, case law in the related § 512(d) context supports reversal. *See Perfect 10 v. CC Bill LLC*, 488 F.3d 1102, 1116-17 (9th Cir. 2007). Section 512(d) is conceptually similar to § 512(c) in that it exempts from liability "infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link." 17 U.S.C. § 512(d). In *CC Bill*, this Court held that CC Bill's hyperlink is as an "information location tool"—thereby immunizing it for that act of hyperlinking to infringing content—but it also held that CC Bill's other business functions—providing services to websites—would fall outside § 512(d). 488 F.3d at 116-17. This Court's interpretation of § 512(d)'s conceptually similar language drew a comparable line of immunity at a service provider's own business functions and activities.

Drawing a line at automated access-facilitating functions devoid of service provider content-based decisions makes sense given the DMCA's basic purpose: to not ensnare legitimate technologists in the strict liability copyright tort because of user acts on their systems, but also to not allow online businesses a free pass that off-line businesses do not enjoy. *See* H.R.Rep. No. 105–551, at 53 (1998) (no

36

immunity for material "that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user."); S. Rep. No. 105-190, at 8 (quoted above); *cf. Roommates.com*, 521 F.3d at 1164 n.15 (on and off-line parity is important in construing scope of Internet immunities).

Ultimately, it is one thing to say, as this Court did in *UMG*, that Veoh's acts were not meaningfully different to traditional web hosts, because Veoh offered a hands-off, automated computer system where a user uploaded any material, Veoh simply accepted it per se (except of course illegal-obscene content), reformatted it to technical specifications required for basic performance of the website, and then published it to the world—a neutral post-and-publish site. But it is altogether different to say that a company can: (1) direct the copying of entire articles owned by third parties with specific rules that require such acts (7ER1116); and (2) pick and choose with human employees and moderator-agents which user content it likes, pick which content it wants to publish, make those selections based on the company's editorial and content preferences that are driven by private pecuniary goals, and then publish the known-stolen (it is "sourced" after all) content (7ER1114-17, 7ER1174:21-1181:6, 7ER1149:18, 7ER1179:10-17, 7ER1166:18-1168:25, 7ER1171:25-1172:24, 8ER1483¶10). Those acts are meaningfully

different both to traditional web hosts and Veoh's access-facilitating acts. Treating them as meaningfully similar makes a mockery of *UMG* and the DMCA.

At root, this is where the district court erred when it concluded that, because the user originally submitted the posts and eventually could access them, LiveJournal's affirmative actions and business decisions were irrelevant. 1ER52:9-10. Consequently, the district court's rule that is limitless: so long as the original offering came from a user, then every subsequent act of infringement or content-based transaction taken by the service provider is immunized, and, thus, all non-access facilitating acts are fully immune. This is not sound.

If a defendant can do anything and everything it wants over the internet with copyrighted material so long as it first received the material from a user, then copyright law ceases to exist meaningfully on the internet. Consider the implications: any person could run its own internet radio station or cable television network merely by soliciting specific submissions from users and displaying those submissions—*The Godfather*, The Beatles' *White Album*—as it sees fit. Imagine the corollary in the non-online world: could a record store sell bootleg albums merely because the infringing albums were given—"submitted," in online language—to the record store by users who dumped them in a box in the alley behind the store? This cannot be what Congress intended in the DMCA. If the district court is correct, then the DMCA is entirely impenetrable no matter what

acts a service provider takes with respect to others' content so long as the content was first uploaded by a user.

Accordingly, this Court should hold that LiveJournal's reproduction, distribution, and public display of content is not at the direction of the user and thus the § 512(c) safe harbor is not available.

> **2.    The district court's decision, if followed, creates a circuit split**

Consistent with *UMG*, the Second Circuit in *YouTube* held that the automated access-facilitating features of YouTube's website were user-directed. 676 F.3d at 39 (conversion-of-uploaded-video feature; website playback feature; automated "related-video" feature based only upon user inputs). But *YouTube* reversed as to one feature of YouTube's website where YouTube took some of the user-uploaded videos and "syndicated" those videos to companies for re-transmission. *Id.* YouTube argued that those alleged infringing acts—like the access-facilitating ones—were at the direction of the user. Not so: "***The plaintiffs argue—with some force—that business transactions do not occur at the 'direction of the user' when they involve the manual selection of copyrighted material for licensing to a third party***." *Id.* (emphasis added).

Here, *YouTube* compels reversal. LiveJournal manually screens and selects among all the proposed content to decide in its discretion which content to even

copy and publish. Thus, LiveJournal's behavior is really no different to YouTube's manual selection process. Each of them manually selects certain content for a specific business use: YouTube picked some of the videos to further distribute, and LiveJournal picks which articles and photos to reproduce and publicly perform to create and curate for profit a niche celebrity-centric site. Drawing this line makes good sense because if a service provider can take user-submitted content and make content-specific decisions about what it wants to do with that content (decisions that run right over the 17 U.S.C. § 106 exclusive rights), it is hard to understand how those acts can still be deemed "at the direction of the user." Accordingly, the district court's decision, if followed now, would create a circuit split.

### 3. LiveJournal's moderators are agents

The district court further concluded that the ONTD moderators were as a matter of law not LiveJournal's agents. 1ER52 n.7. At summary judgment, this conclusion is meritless.

The closest case is the district court's decision in *Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009), which was not overruled by this Court in *Fung*, 710 F.3d 1020. There, the district court held that where a website had moderators who monitored the site's forums, deleted posts as necessary, and secured their status from the website owner, the moderators

were agents of the site. *Fung*, 2009 WL at *13 & n.21. The court made this unremarkable conclusion—not disturbed by this Court—under Restatement principles. *See id.*; *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-52 & n. 31 (1989) (Restatement used for agency under Copyright Act). Under the Restatement, an agency relationship is created "by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." *Restatement (Third) of Agency,* § 3.01 (2006).

In *Malloy v. Fong*, 37 Cal.2d 356, 372 (1951), a church pastor managed a church's school program. At one point the pastor asked a church member, Fong, to help. One time, an accident in Fong's car injured a child. Plaintiff sued and won, including on the issue of whether the church had respondeat superior liability for Fong's negligence. The church moved for a directed verdict, in part because it argued that Fong was not its agent. The California Supreme Court disagreed, noting that Fong's connection with the school was possible only because the pastor gave his consent, and the pastor could have severed Fong's relationship at any time. Therefore, "Fong, with [the pastor's] knowledge and consent, performed duties for which the latter was responsible, that his performance of those duties was subject to [the pastor's] supervision and control, and … his services could be terminated at any time, [all of which] supports the conclusion that Fong was a

41

subagent acting with the scope of his agency at the time of this accident." *Id.* at 373-74; *see also* CACI 3705 (jury instruction governing the existence of an agency relationship).

Here, the same result follows. Under agency principles, the ONTD unpaid moderators-maintainers are LiveJournal's agents. LiveJournal owns the site. LiveJournal is the only party that profits from the advertising revenue. 7ER756:9-757:17. LiveJournal has complete authority to make and dismiss moderators-maintainers, as well as complete authority over the ONTD rules. 7ER1257:9-1258:3 (owner can control rules and who can use the site). The moderators' work is even performed with a livejournal.com email address. 5ER778-79. And even if LiveJournal could establish that, like Mr. Fong in *Malloy*, the moderators-maintainers do their work on the site as an unpaid labor of love, that fact would not matter. Unpaid volunteers can be agents. The work they do is work that ultimately must be done and inures to LiveJournal's sole financial benefit, and they can be fired by LiveJournal at any time.

Moreover, Delzer runs the site and supervises the unpaid moderators-maintainers. Delzer is the "Editor," "primary leader" and "head maintainer" of ONTD, and he acts "in an elevated status" relative to the other moderators/maintainers. *Supra* § IV.2.a (citing record). Like any master, he was given this position without the other moderators being consulted; they were

42

informed and told they could continue with the site or leave. 16ER3196-99.

Delzer makes decisions as to the site's rules. 16ER3410-11 & 16ER3426-27

(keeping in place the infringement-inducing copy-the-entire-article rule);

16ER3198 (LiveJournal hiring Delzer and making changes to rules). Those are the

very rules that the moderators-maintainers enforce as they sift submissions for

desired content.

Finally, Delzer regularly gives moderators direction and supervision.

16ER3420-23 (lengthy post instructing moderators and maintainers, among other

things, as to what should and should not be accepted and even criticizing the

performance of one moderators, lestat, for the way he performed his duties);

16ER3420-21 ("please reject any posts sourced from the site 'whatculture.com' –

mostly it's just dumb lists anyway…."); 16ER3416-17 ("Who keeps approving

posts above FFAF?! Rule of thumb: don't approve posts for at least ONE HOUR

after FFAF."); 16ER3404-06 ("HEY GUYS! Just 2 new things to look out for

when accepting posts:"), 16ER3424-25 ("just an fyi, someone approved a post

from [redacted] that was completely made up – as in … none of the text was at the

source. Please be a little more observant:)").

Delzer thus acts as the master/principal; and the moderators derive status

from LiveJournal to perform their functions. Accordingly, an agency relationship

43

exists as a matter of law, actual and apparent, and the no-agency summary

judgment cannot stand.

### 4.    Conclusion

This Court should hold:

1.    Under § 512(c)(1), where a service provider with its employees or its

agent-moderators picks and chooses among user submissions as to which

submissions it will publish, the infringement is not at the direction of the user.

Those acts of infringement—the actual selection among various content offerings

of which ones to reproduce and publicly display—are not "access-facilitating" acts

(or akin to electronic storage acts) within *UMG*.  Instead, those active content-

curation and editorial steps exist at the direction of the service provider, and are not

user-directed acts.  What LiveJournal does—manual, discretionary determination

of what content to accept and reject—is different in kind to Veoh's acts—

automatic computer recasting of all content—and is what *YouTube* held was

outside the scope of legitimate access-facilitating acts and, therefore, not at the

direction of the user.  LiveJournal's acts and decisions are its responsibility.

2.    Where a website company provides third party moderators with an

official email address, the right to edit user-submitted content to the company's

site, the right to apply the website's rules, which rules the website owner can

control and alter at its discretion, and has ultimate authority to assign or fire them

as moderators, those moderators are as a matter of law actual and apparent agents

(or at a minimum jury issues exist).

## C. Summary judgment on the "right and financial ability to control" prong was wrong

Under §512(c)(1)(B), LiveJournal loses if it (1) "receive[s] a financial benefit directly attributable to the infringing activity"; and (2) "has the right and ability to control such activity." The district court only addressed the first prong. 1ER56-57.

### 1. Right and ability

*UMG* and *Fung* frame the inquiry. As *UMG* held, "something more" than the general ability to locate and disable access to infringing material is required. 718 F.3d at 1030. *UMG* cited favorably either to (1) purposeful conduct under *Grokster* as being that "something more" or (2) the scenario of a website that provides detailed instructions regarding layout, appearance and content, and further forbids certain categories of content. *Id.* (*citing Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1163 (C.D. Cal. 2002)).

Here, both are met. First, as discussed below in § D.3.b, LiveJournal amply meets the *Grokster* purposeful conduct standard. The district court rejected this conclusion by making a credibility determination about the quality of Mavrix's evidence when it construed the ONTD rule as not requiring the theft of others'

45

content despite its literal requirement to "*include the article and pictures in your post.*" 1ER57:5-58:6. While LiveJournal could argue to the jury that the rule should not be interpreted literally (cat really means dog?), at summary judgment the rule is what it is and must be interpreted in Mavrix's favor: it requires the taking of the entirety of others' works. Ultimately, this conduct is worse that Grokster's P2P software, because as bad as Grokster was even it never required people to upload others' music. *Infra* § D.3.b.

Second, LiveJournal provides detailed rules about the exact type of content that users may submit (current celebrity content, 7ER1116, 7ER1171:25-1172:24), the appearance of that content (fully without edits and with the source, 7ER1116, 7ER1202:10-1203:16), and what content is not permitted (untimely content, political content, and other non-celebrity content, 7ER1116, 7ER1179:10-17). Against this, the district court simply stated that Mavrix had no evidence of this (1ER58:13-17), but the conclusion is demonstrably not true and the facts here fit within *UMG's* cited *Cybernet* scenario.

The district court also seemed to believe that users uploaded content when in fact, as was pointed out, the users do no such thing. 1ER56:10-25. Rather, users offer only submissions; ONTD employees and agents decide what content in fact gets reproduced and publicly posted. 7ER1142:11-1143:5, 7ER1146:1-1147:17, 7ER1130:12-17. This important distinction infected the entire decision.

Next, the district court stated (without citation) that LiveJournal does not solicit infringing content or have the ability to edit it. 1ER56:14-16. Not true. The record shows that LiveJournal's rule expressly requires the submission of the entirety of others content. 7ER1116. The record further shows LiveJournal can edit the content if it wants and even pondered doing just that, but chose not to. 16ER3410-11, 16ER3426-27, 16ER3198.

Moreover, the district court's focus on knowledge of specific infringing activity within this factor (1ER56:14-15) was itself wrong, because "§ 512(c)(1)(B) does not include a specific knowledge requirement." *YouTube*, 676 F.3d at 38. Indeed, the level of user influence needed to fulfill § 512(c)(1)(B)'s "right and ability to control" standard occurs "without necessarily—or even frequently—acquiring knowledge of specific infringing activity." *Id.*

The district court then tried to minimize Mavrix's evidence of Delzer's control by stating that it failed to show "substantial control." 1ER57:1-3. But this is simply an incanted conclusion at odds with staggering evidence of substantial— indeed complete—control:

● Liveournal has complete authority over the rules moderated by Delzer-moderators.

● LiveJournal has complete authority over ONTD content including the ability to add/remove it.

47

● Delzer gives instructions to moderators about how to apply the ONTD rules.

● Delzer has criticized the moderators he supervised for accepting unsourced submissions. *Supra* § IV.E.2.a&b (record cites).

Ultimately, *UMG* found that Veoh lacked the requisite "something more" because it was not involved in the automated process, did not personally review or select files, and simply had the technical ability to search and remove. 718 F.3d at 1030. But LiveJournal is hardly a comparable couch potato vis-à-vis the content appearing on its site.

*Fung* also supports Mavrix. On comparable facts, this Court found Fung had the requisite control because he organized files, removed ones he did not want, and had culpable, inducing behavior. 710 F.3d at 1045-46. This case is easily comparable given LiveJournal's discretion to accept to reject files for upload/publication, and its absolute ability to remove files it does not want. Coupled with the staggering *Grokster* inducing-like conduct (*infra* § D.3.b), summary judgment for LiveJournal cannot fairly follow. Even if Mr. Fung is seen as more nefarious than LiveJournal, nowhere did this Court state that his behavior is the minimum required. Nor can Mr. Fung be deemed a worse actor because he infringed motion pictures of major Hollywood movie studios, because judicial assessment of the relative value of the works is improper. *See, e.g.*, *Bleistein v.*

48

*Donaldson Lithography Co.*, 188 U.S. 239 (1903); *Grace v. Bradford Exchange*, 698 F.2d 300 (7th Cir. 1983).

Finally, courts have consistently declined to require a principal-agent relationship to find that an entity had the right and ability to control the actions of infringers. *See, e.g., Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1439-40 (3d Cir. 1994); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 745 (D. Md. 2003); *Realsongs v. Gulf Broad. Corp.*, 824 F. Supp. 89, 92 (M.D. La. 1993); *Warner Bros., Inc. v. Lobster Pot, Inc.*, 582 F. Supp. 478, 482 (N.D. Ohio 1984).

### 2. Direct financial benefit

This Court should address the "financial benefit directly attributable to the infringing activity" issue. The matter was fully briefed below, is a question of law, and the risk of a wasteful further appeal supports calling the question now.

*Fung* mandates a summary adjudication of this question in Mavrix's favor. *Fung* held that a service provider's receipt of advertising revenue, instead of subscription monies from users, where the revenue depended upon the number of viewers meets the standard, especially where the site's draw was the infringing content. 710 F.3d at 1045.

Here, the factor is readily met. LiveJournal hired Delzer to be the Editor in charge of ONTD so that it could monetize the website with ad revenue. 16ER3196. It wants to increase visitors because that increases money. 7ER1154:17-1155:3, 7ER1299:13-20, 7ER1308:2-7. Visitors come to see celebrity content and specifically relevant here celebrity photographs. *Id*. Almost all the content that draws the viewers—84% of it—is infringed and unlicensed content. 6ER945-48¶1-11, 6ER1000-1110 (analysis). This case thus is virtually indistinguishable from *Fung*. *See also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (finding that Napster financially benefited from infringement on its network based simply on the fact that infringing materials served as a draw for customers).

### D. Summary judgment on actual and red-flag knowledge was wrong

Under §512(c)(1)(A)(i)-(ii), "to qualify for the safe harbor, a service provider must either (1) have no actual knowledge ***and*** no 'aware[ness] of facts or circumstances from which infringing activity is apparent' [*i.e.*, red-flag knowledge] or (2) expeditiously remove or disable access to infringing material of which it knows or is aware." *UMG*, 718 F.3d at 1020 n.11. Here, the district court found in LiveJournal's favor on actual and red-flag knowledge. It erred.

50

1.    **Actual/red-flag knowledge**

While *UMG* addressed the actual knowledge standard in § 512(c), it did so in a very narrow context.  Specifically, because Veoh lacked any clear indicia of mens rea—it had a totally automatic uploading process with no active personal review of content—UMG was only able to contend that Veoh possessed the requisite "actual knowledge" because its website contained uploaded music and could therefore facilitate infringement.  *Id*. at 1011-12, 1022.  Such an argument was plainly impossible given *Sony Corp. v. Universal City Studios, Inc*., 464 U.S. 417 (1984), the seminal case that rejected the idea of imputing actual knowledge simply because a service/product is capable of both infringing and non-infringing uses (there, the VCR).  Not surprisingly, then, *UMG* held that for Veoh to be liable, it needed some form of specific knowledge.  As to Veoh on those facts, that much may be fair.

But *UMG* never held (nor did *Sony*) that the ***only*** way liability can attach is where the party has specific knowledge of specific infringements.  Rather, *UMG's* holding is incredibly narrow: "We therefore hold that merely hosting a category of copyrightable content, such as music videos, with the general knowledge that one's services could be used to share infringing material, is insufficient to meet the actual knowledge requirement…" *Id.* at 1022.  As such, for Veoh to be liable, given the facts, it needed specific knowledge.

51

But applying a "specificity" overlay in all cases, as the district court effectively did, would create a massive break between liability for non-internet and internet entities, and would flout *Fonovisa v. Cherry Auction*, 76 F.3d 259 (9th Cir. 1996)—a case *UMG* and *Fung* each cited favorably, *see UMG*, 718 F.3d at 1032; *Fung*, 710 F.3d at 1044 n.21, 1046—where in the off-line world knowledge of rampant infringement (but not "specific" infringements) sufficed for liability. There, the Cherry Auction swap-meet faced secondary liability because it provided the means for infringement, knew in general that infringement occurred (even if it did not know of any specific instance), and benefitted from the revenue it received due to the presence of infringing content. 76 F.3d at 262-64.

But under LiveJournal's worldview (and the district court's apparent worldview, *see* 1ER55 n.10), if Cherry Auction went from physical space to cyberspace as www.cherryauction.com, it could engage in identical activity—creating a space where rampant copyright infringement takes place while collecting revenues for doing so—and it would be immune because it was not aware of any "specific" CD sales to specific customers. This was not the DMCA's intent. To the contrary, the DMCA was enacted to ensure that real internet service providers would not be liable when they merely served as passive conduits and were uninvolved in editorial decisions about others' content. *See* S. Rep. No. 105-190, at 8-9 (1998); H.R.Rep. No. 105–551, at 53 (1998).

Accordingly, here—decidedly not a mere *Sony-UMG* capable-of-infringing case—the Court should simply ask the statute's offered question: whether there are facts that demonstrate "actual knowledge that the material…on the system…is infringing." 17 U.S.C. § 512(c)(1)(A)(i). The answer is "yes" as explained below in §2.a. And even if the Court adopts a "specificity"-based knowledge standard, the answer is still "yes" as explained.

### 2. Actual knowledge

#### a) Actual knowledge exists even with a specificity overlay

At its inception, LiveJournal directs its users to use its services to infringe by establishing a rule that requires taking not just part but all of others' content. 7ER1116. Employee Delzer then spends all day every day on the ONTD site. 7ER1121 (article quote), 7ER1212-15 (de position testimony confirming accuracy). Remarkably, Delzer even checks the original source content to make sure users copy it properly. 16ER3424-25. Consequently, he sees all the uploads, both the ones he approves and those approved by others. 7ER1147:24-1148:3, 7ER1121, 7ER1212-15. The ONTD rules he enforces require others' content to be submitted for LiveJournal's consideration for publication. 7ER1116. Under those rules that Delzer and the moderators enforce, users must submit with the offered content the third party name/source from whom the content was copied. *Id.*; 16ER3460-61, 17ER3465. Delzer has even criticized users who do not give a

source for where their material comes from, because he wants to know the source the material was lifted from. 16ER3418,3424,3396,3398,3400. LiveJournal admits even that it knows that taking full articles is not permitted. 16ER3433-44. And 84% of the content is obviously unlicensed and indeed infringing. 6ER944-48. LiveJournal even mocks-laughs at users who think their wholesale copying of others' articles for submission to ONTD is not infringement, demonstrating its actual knowledge that the acts are infringing. 16ER3433-44. If that is not actual knowledge (or at least a triable issue on it), then what is?

From these facts a jury most certainly could conclude that Delzer, a LiveJournal employee, is aware that almost *every* single post is stolen from somewhere else. By definition, he saw Plaintiff's material on ONTD because he admits he looks at all content. 7ER1147:24-1148:3, 7ER1121, 7ER1212-15. Some of Mavrix's content submitted and then approved for public posting even had the name "Mavrix" printed with it. 5ER894-95. Others were watermarked (15ER3107-16), itself an obvious visual indicia (to one who views every post) that a third party has rights. Delzer looked at every post, by definition including the ones with Marvix's name written on them. A jury could reasonably conclude that he knew of those specific images, even if he later claimed in deposition that he could not recall. Thus, at a minimum there are issues of fact as to Delzer's actual knowledge of even *specific* Mavrix content requiring reversal.

*YouTube* also supports reversal. There, the court reversed on the actual (and red-flag) knowledge standard, because there was evidence that a YouTube manager believed certain uploads to be unlawful. 676 F.3d at 34-35. Here, the comparable facts are even greater: when users complain to LiveJournal that their previously-accepted submissions were taken down after a rightsholder's complaint, arguing to LiveJournal that because they followed its rules their material should be left up, LiveJournal employees mock them for their ignorance on copyright law, noting that copyright law does not allow the lock, stock, and barrel taking of others' creations. 16ER3433-44. Just so.

### b) The district court ignored the facts-arguments and got sidetracked on its own-invented issues

Below, Mavrix pressed this argument (5ER810-13) and the district court ignored it entirely. The district court's only analysis centered on one piece of evidence—namely that the photographs are professional—and ignored all these other facts presented and argued. 1ER53:22-54:21. As to that one argument, the district court's conclusion that the "nature of the photographs" compels the conclusion that no one would know the photos are professional is literally without record evidence—primarily because LiveJournal never even argued it and thus offered no such evidence to the district court! Rather, it is a judicial statement by

fiat and a *factual* conclusion that a court at summary judgment is not permitted to make.

Finally, the district court appeared motivated (and got sidetracked) by the idea that Mavrix's photos were somehow "unauthorized." 1ER54 n.9. Note, LiveJournal never argued this, because it is flat wrong factually and legally. When Beyoncé or Katy Perry walk in public, no law requires Mavrix to secure their consent to take a photo. (Ironically, that's the only clear First Amendment principle in this case). Literally, no facts in the record show Mavrix's photos are "unauthorized," a conclusion that was simply invented and which massively underscores the district court's entire misapprehension of the issues before it.

### 3. Red-flag knowledge

As explained above, there should be no specificity requirement for red-flag knowledge in this case, that requirement being reserved for neutral technologists who at most have general knowledge their service/product could be used to infringe. But as above, even if there is a specificity requirement, here it was met (and certainly triable fact issues exist). As with actual knowledge, Mavrix presented a whole range of facts that bore on red-flag knowledge, but the district court ignored it and focused on the one fact addressed above, 1ER54:1-21, and in a footnote the district court appeared to adopt a specificity-requirement as to red-flag

knowledge. 1ER55 n.10. When the standard is properly understood and the facts adduced, the summary judgment cannot stand.

### a) This Circuit's law requires reversal

First, "a service provider cannot willfully bury its head in the sand to avoid obtaining such specific knowledge [of infringement]." *UMG*, 718 F.3d at 1023. This legal principle was eviscerated by the district court's conclusion because what LiveJournal does here is far worse than burying its head. LiveJournal is not just avoiding knowledge of mass infringement; its business model is based on actively encouraging the citizenry to engage in mass infringement with rules that require the taking of other's material (things LiveJournal knows are wrong and laugh at users who do it, 16ER3435), and, as it and its employee Delzer plainly knows from his review, approximately 84% of the material is almost certain to be infringing (*supra* § IV.E.2.c). Even if Delzer did bury his head as to any particular, specific infringement—one might cynically argue that it is difficult to have specific red-flag knowledge of any one infringement when you are busy encouraging (with the rules) and personally reviewing hundreds of infringing uploads every day—that asserted lack of red-flag knowledge as to a specific infringement should not allow LiveJournal to escape liability. To do so effectively eliminates the head-burying basis for loss of the safe-harbor. This case thus requires this Court to breathe some life into the anti-ostrich admonition.

57

Second, this Circuit's case law spans various points on the spectrum of red-flag knowledge. On one end, there is *UMG*, where Veoh lacked specific red-flag knowledge because all UMG could point to was the (*Sony* VCR) idea that Veoh had to know people would use its services to infringe. With *UMG* is *CC Bill*, where this Court held that hosting of others' websites where some of the hosted websites used names that implied illegal activities was itself insufficient to establish red-flag knowledge. 488 F.3d at 1114. But that is hardly this case, because LiveJournal asks users to give it others' copyrighted material so that it (1) may choose which copyrighted material it likes best and (2) then publish its chosen submissions. When users submit content with a "source"—something LiveJournal requires—that identification of the source—namely, that it does not belong to the user and belongs to the source—gives immediate red-flag knowledge across every submission. When Mavrix's photos were submitted—some of which had Mavrix's name listed on them and all of which Delzer looked at even if he can't remember exactly—that also gave red-flag knowledge that Mavrix's photos belonged to a third party. When the rule requires lifting of the entirety of others' content, that gives red-flag knowledge that the content submitted by users is per se infringing. And when, as shown above, LiveJournal's employees admit to their users that the taking of an entire article—which their rules require!—is copyright infringement, red-flag knowledge explodes off the page. What is more, LiveJournal's other

58

websites are used to trade passwords to hack companies like Mavrix so as to steal their photos (which photos then appear on ONTD). Thus, these facts place this case at the other end of the spectrum occupied by *UMG* and *CC Bill*.

Nor can simply removing material—after rightsholders expressly complain—bless the entirety of the above conduct, as if returning stolen goods when asked negates the robbery, and *UMG* cannot be fairly read to say as much.

*Fung* sits at the other end of the spectrum, and applied here itself requires either an outright finding of red-flag knowledge or at a minimum that the question go to the jury. There, defendant Fung operated a website that urged users to upload copyrighted works, assisted people in locating copyrighted works to upload, himself uploaded copyrighted works, and even helped users burn works onto DVD's. 710 F.3d at 1043. This Court found Fung had red-flag knowledge as a matter of law. Here, LiveJournal is no different. It urges users to take works from third-party websites, works that by definition are copyrighted to those sites/other authors. It reviews the works to make sure enough of the work—as in all of it—was taken. It through Editor Delzer and agent-moderators selects ones it likes based on its preferences for the content it wants to broadcast, and then chooses those to actually upload to the site. Indeed, LiveJournal's employee and moderators approve every single piece of content, unlike Fung who did not even review all content. Thus, under *Fung* enough of a factual predicate exists to

59

establish red-flag knowledge (or at a minimum establish genuine trial issues).

*Fung* after all never purported to be a floor such that any set of facts less culpable ipso facto means no red-flag knowledge exists. *See also YouTube*, 676 F.3d at 34-35 (reversal on red-flag where defendant perceived certain uploads to be illegal).

Finally, *Fung* held that a service provider has red-flag knowledge when "[t]he material in question was sufficiently current and well-known that it would have been objectively obvious to a reasonable person that the material solicited and assisted was both copyrighted and not license to random members of the public." 710 F.3d at 1043. With (1) no licenses with any third party sources and (2) a website built entirely on user submissions (and moderator and agent postings) (3) of sourced, third-party-owned content (4) featuring complete reproductions of articles-photographs of ***current*** celebrity happenings and (5) where 84% of the content was infringing, a jury could certainly conclude that ONTD is replete with content that would have been "objectively obvious to a reasonable person that the material solicited and assisted was both copyrighted and not licensed to random members of the public." *Id.* To grant summary judgment—as if the content may really have been created-owned by the users who submitted it rather than the identified, sourced owners—effectively means that there is no such thing as red-flag knowledge.

**b)** *Grokster*

A good analogue to understand the DMCA's willful blindness concept is seen in *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), which dealt with the imposition of secondary liability based upon knowledge of infringement. "[N]othing in *Sony* requires courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from the common law. Thus, where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and ***shows statements or actions directed to promoting infringement, Sony's staple-article rule will not preclude liability***." *Id.* at 934-35 (emphasis added). Thus, the Court held that "***one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties***." *Id.* at 936-37 (emphasis added).

Here, LiveJournal is similar to Grokster in that it accomplishes the same goal—actively encouraging mass infringement in order to gain advertising revenues— using equally culpable means. Because LiveJournal actually asks for submission of others' content, stores the infringed material, reviews it, and chooses which of the submissions to subsequently publish (via reproduction, distribution and public display)—rather than simply helping users provide infringing material

61

to each other through a P2P software platform like Grokster—this means that

LiveJournal has far more information and exerts far more control over the

infringing material than even Grokster ever did. While *Groskter* was not a DMCA

case, the concepts must be comparable lest there be a massive break between

online and offline liability. *See, e.g.*, *UMG*, 718 F.3d at 1021-22 (analogizing to

off-line copyright law to assess DMCA).

Indeed, it is absurd to think that the Supreme Court that decided *Grokster*

would be fine with Grokster restarting at www.grokster.com, telling users to

upload music files identifying the source musician-band, then picking which songs

it wants to make available so it can create a niche music site, and post those files

for public consumption, and that would be perfectly fine under the DMCA,

whereas the issuance of P2P software was extreme malfeasance.

### 4. Expeditious removal upon acquiring knowledge

Section 512(c) safe harbor requires that ISPs "respond expeditiously to

remove" in two different sections. In § 512(c)(1)(C), it uses the term to require

expeditious removal when a takedown notice is sent. But it also uses the term to

require expeditious removal in another section—512(c)(1)(A)(iii)—when an ISP

obtains knowledge or awareness of infringement by reason of storage at the

direction of the user. The latter clause can't be read as being co-terminus with the

former requirement, or else that would render the latter clause superfluous and that

62

would violate a basic rule of statutory construction. As such, § 512(c)(1)(A)(iii) imposes a requirement of expeditious removal even without the receipt of a takedown notification. It requires takedown upon obtaining knowledge of infringement—red-flag or actual.

Here, as demonstrated above, LiveJournal had knowledge—actual and/or red-flag—at the time the Mavrix photos were uploaded and posted. The photos were posted between July 19, 2010 and April 2013. 5ER827-95. Yet they were not removed until after this lawsuit was filed, many months and years later in some cases. While the district court failed to address this briefed issue, this Court must conclude that a delay of that many years or months—after having actual or red-flag knowledge—is as a matter of law not an "expeditious" removal.

## VIII. <u>CONCLUSION</u>

1. The Court should reverse the discovery ruling and remand with an order for LiveJournal to produce the discovery information and an order expressly allowing Mavrix to conduct further depositions/discovery on the moderators; and

2. The Court should reverse the DMCA summary judgment outright and grant Mavrix summary judgment in light of the "at the direction of the user" prong, which as a matter of law LiveJournal simply cannot satisfy. If the Court concludes that Mavrix is not entitled to a summary judgment on this issue (or that it belongs to the jury), then it should grant summary judgment outright to Mavrix on the right

63

and ability to control prong. If the Court concludes that Mavrix is not entitled to a summary judgment on this issue (or that it belongs to the jury), then it should hold that as a matter of law LiveJournal possessed actual or red-flag knowledge. If the Court concludes that Mavrix is not entitled to a summary judgment because fact issues exist on the knowledge questions, then it should remand for trial on all three DMCA issues, but at the same time issue a partial summary adjudication of the direct financial benefit issue and expeditious removal issue which should be adjudged in Mavrix's favor as a matter of law.

Dated: April 15, 2015                    Respectfully submitted,

*/s/ Peter R. Afrasiabi*
Peter R. Afrasiabi
Christopher W. Arledge
John Tehranian
**ONE LLP**
*Counsel for Plaintiff/Appellant,*
*Mavrix Photographs LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32</u>
### Certificate of Compliance With Type-Volume Limitation,
### Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X]  this brief contains 13,904 words per the Microsoft Word Count function, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    [ ]  this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]  this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font, *or*

    [ ]  this brief has been prepared in a monospaced typeface using _____ with _____.


Dated: April 15, 2015                    */s/ Peter R. Afrasiabi*_____
                                         Peter R. Afrasiabi
                                         Christopher W. Arledge
                                         John Tehranian
                                         **ONE LLP**
                                         *Counsel for Plaintiff/Appellant,*
                                         *Mavrix Photographs LLC*

65

## <u>STATEMENT OF RELATED CASES</u>

Appellant is not aware of any related cases.

Dated: April 15, 2015
              */s/ Peter R. Afrasiabi* _____
              Peter R. Afrasiabi
              Christopher W. Arledge
              John Tehranian
              **ONE LLP**
              *Counsel for Plaintiff/Appellant,*
              *Mavrix Photographs LLC*

66

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 15, 2015.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Peter R. Afrasiabi*
Peter R. Afrasiabi