Case No. 14-56596

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

MAVRIX PHOTOGRAPHS LLC,

Plaintiff – Appellant,

*v.*

LIVEJOURNAL, INC.

Defendant – Appellee.

On Appeal from the U.S. District Court, Central District of California
Case No. 8:13-cv-00517-CJC-JPR

---

# BRIEF OF FACEBOOK, INC.; GITHUB, INC.; GOOGLE INC.; IAC/INTERACTIVECORP; KICKSTARTER, PBC; PATREON, INC.; PINTEREST, INC.; THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; AND THE INTERNET ASSOCIATION IN SUPPORT OF PETITION FOR REHEARING

---

Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
(212) 999-5800

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici make the following disclosures.

Facebook, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

GitHub, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Google Inc. is a wholly owned subsidiary of Alphabet Inc.; accordingly, Alphabet Inc. has more than 10% ownership of Google Inc.

IAC/InterActiveCorp has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Kickstarter, PBC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Patreon, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Pinterest, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

The Computer & Communications Industry Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

The Internet Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

INTEREST OF THE *AMICI* .......... 2

ARGUMENT .......... 3

I. THE PANEL'S RULING OVERLOOKS KEY ASPECTS OF THE DMCA'S TEXT AND PURPOSE .......... 5

II. THE PANEL'S RULING THREATENS VALUABLE PRESCREENING EFFORTS BY ONLINE SERVICES .......... 12

CONCLUSION .......... 18

APPENDIX A .......... 19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ............ 12, 14

*Capitol Records, LLC v. Vimeo, LLC*,
826 F.3d 78 (2d Cir. 2016) ............ 2, 11

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ............ 16

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) ............ 6, 7, 10

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) ............ 2, 7

*Viacom Int'l, Inc. v. YouTube, Inc.*,
940 F. Supp. 2d 110 (S.D.N.Y. 2013) ............ 7

### STATUTES

17 U.S.C. § 512(a)(2) ............ 9

17 U.S.C. § 512(a)(4) ............ 10

17 U.S.C. § 512(c)(1) ............ 3, 5

17 U.S.C. § 512(k)(1) ............ 9

17 U.S.C. § 512(m) ............ 11

17 U.S.C. § 512(n) ............ 9

47 U.S.C. § 230(c) ............ 12

### MISCELLANEOUS

H.R. Rep. No. 105-796 (1998) ............ 11

## INTRODUCTION

The safe harbor provided by Section 512(c) of the DMCA is vital to the daily operation of countless online services that host user-submitted content. The panel's decision in this case throws the scope of this protection into serious doubt. The panel's unprecedented interpretation of the statute's "storage at the direction of a user" provision transformed an easy-to-understand rule into a murky standard that cannot be squared with the DMCA's text, structure, or purpose.

Unless corrected, this ruling will have serious consequences. The panel can be read as suggesting that service providers' efforts to screen user-submitted material before it is posted may put their safe harbor in jeopardy. This has already created tremendous uncertainty in the online community, raising fears that established content-moderation practices suddenly may be deemed incompatible with the DMCA. That fear may compel some providers to scale back or abandon beneficial efforts to prevent illegal or offensive content from being posted, to the detriment of online services, their users, and copyright holders alike. This may not be what the panel intended, but it certainly is not what

Congress wanted or what the statute prescribes. Rehearing is warranted to alleviate the many concerns raised by the panel's opinion.

## INTEREST OF THE *AMICI*

*Amici* are leading online service providers (and organizations representing such providers) who depend on Section 512(c) of the DMCA in their daily operations.[1] Collectively, *amici* have billions of users and host an almost unimaginably vast and diverse amount of user-submitted content, including text, music, video, and photographs. All of this is made possible by the 512(c) safe harbor, and *amici* have regularly been parties in cases applying this vital protection. *See, e.g.*, *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012); *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78 (2d Cir. 2016).

*Amici* are deeply concerned about the panel's decision in this case, in particular its suggestion that LiveJournal may not be covered by Section 512(c) based on the efforts it makes to moderate user-submitted

[1] *Amici* are Facebook, Github, Google, IAC/InterActiveCorp, Kickstarter, Patreon, Pinterest, the Computer & Communications Industry Association, and the Internet Association. A complete description of *amici* is provided in the attached appendix. No counsel for any party authored this brief in whole or part; no party or party counsel made a monetary contribution intended to fund its preparation or submission; and no person other than *amici*, their members, or counsel made such a contribution. All parties have consented to the filing of this brief.

content before it is posted. Never before had such prescreening activities been invoked as a possible basis for categorically evicting a provider from the safe harbor. Read broadly, this ruling may force other service providers to make an unpalatable choice between DMCA protection and various forms of content review that help make their services safer and more hospitable for their users. *Amici* submit this brief to explain the considerable threat that the panel's decision poses to the stability of the DMCA regime and to the quality of content on the Internet.

## ARGUMENT

The 512(c) safe harbor protects online service providers against copyright infringement claims that arise "by reason of the storage at the direction of a user" of material that resides on a provider's system or network. 17 U.S.C. § 512(c)(1). In this case, the panel reversed a grant of summary judgment to LiveJournal under this provision. In so doing, the panel cast a cloud of uncertainty over the DMCA.

*Amici* are especially concerned about two aspects of the panel's decision. *First*, the panel suggested that user-submitted materials that LiveJournal manually reviewed before allowing them to be posted may not be "stor[ed] at the direction of a user" and thus may not be protected

by Section 512(c) unless a fact finder determines that the reviewing activities were "'narrowly directed' towards enhancing the accessibility of the posts." Op. at 19-21. *Second*, the panel suggested that LiveJournal's "extensive review process," including its efforts to prevent infringing material from being posted, may give it the "right and ability to control infringement[]," which may further jeopardize its safe harbor. Op. at 26.

While the scope of these holdings is far from clear, they undoubtedly will make it more difficult for LiveJournal (and other service providers) to ensure that their operations are protected under Section 512(c). The panel's decision threatens to expose online services to a possible loss of DMCA protection simply because they make efforts to screen content that users submit for posting. If the panel intended that result, its decision is profoundly mistaken, and it will harm not just service providers and their users, but copyright owners as well. If not, the panel has created unnecessary confusion. Either way, the panel's ruling in this case will vex parties and lower courts for years to come unless it is corrected through rehearing.

## I. THE PANEL'S RULING OVERLOOKS KEY ASPECTS OF THE DMCA'S TEXT AND PURPOSE

The panel held that LiveJournal may not be entitled to the 512(c) safe harbor by virtue of its "manual, substantive review process" (Op. at 20 n.12) and that it might have disqualifying "control" in light of its "extensive review process, infringement list, and blocker tool" (Op. at 26). Under these rulings, service providers who moderate user-submitted content in an effort to weed out possible infringement and other objectionable material before it is publicly available now may do so at the expense of safe-harbor protection. That cannot be squared with the DMCA. In ordering LiveJournal to trial, the panel overlooked a number of factors that should have compelled a different result.

*First*, the panel's approach is unmoored from the statute's text. Section 512(c) says nothing about the "submitting," "posting," or "screening" of content. The threshold question it asks is just whether the material at issue was stored "at the direction of a user." 17 U.S.C. § 512(c)(1). This language requires simply that the allegedly infringing materials (1) originated with the user, rather than the service provider; and (2) came to be stored on the provider's system following an instruction or request from the user. Whether the service provider screened

such content for relevance, legality, or some other criteria prior to its being posted is irrelevant. Under the plain text of the statute, material submitted for posting by a user is still stored "at the direction of" that user even when it goes through some review process before becoming accessible to the public.

The panel ignored this straightforward reading. Instead, it recast the "at the direction of a user" issue as an entirely new test focused on whether the service provider's post-submission screening activities are "'narrowly directed' towards enhancing the accessibility of the posts." Op. at 19. That is a non-sequitur. The test that the panel adopted is from *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013). But that case addressed a wholly different issue: whether Section 512(c) covers activities that go beyond the "storage" of user-submitted content (such as reformatting it to make it accessible via mobile devices or allowing it to be downloaded). *Id.* at 1015-20. The Court agreed that the statute's "broad[] causal language" reached those activities. *Id.* at 1016.

The *Shelter Capital* test, in other words, is about whether certain post-upload functions are causally connected to *storage*, not about

whether materials are stored *at the direction of a user* in the first instance. *Id.* at 1019 n.10 ("we affirm the district court's holding that the 'by reason of storage' language in § 512(c) *itself* covers the access-facilitating automatic functions Veoh's system undertakes"); *see also Viacom*, 676 F.3d at 39-40 (same holding). It makes no sense to mechanically apply that test to this new context: efforts by service providers to limit objectionable or irrelevant content from appearing on their systems. The court in *Shelter Capital* certainly did not. Nor has any other court.[2] And doing so produces only confusion and uncertainty.

Indeed, the panel did not explain what it would mean to ask whether a provider's ex ante content-review decision is "'narrowly di-

[2] The panel pointed to the discussion of "syndication" in the *Viacom* case. Op. at 20 n.12. But *Viacom*, like *Shelter Capital*, had nothing to do with ex ante content review. Instead, the question was whether Section 512(c) covered user videos on YouTube that were made available for viewing by users of *other* services. *Viacom Int'l, Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 122-23 (S.D.N.Y. 2013). The court held that it did. *Id.* at 123. While there was one instance where YouTube "manually selected videos which it copied, took off the YouTube system, and delivered by hand so that the recipient could make them available from its own system," the court did not address whether that was covered by Section 512(c) because those videos were not among those at issue in the case. *Id.* at 122. *Viacom*'s broad (and correct) reading of Section 512(c) in no way supports the idea that by reviewing user-submitted content before it is posted, a service provider may put its safe harbor on the line.

rected' towards enhancing the accessibility of the post[]." Nor did it even try to apply its test to the facts, leaving that for the court (or jury) on remand. Op. at 20-21. While the panel did say that "[s]ome manual service provider activities that screen for infringement or other harmful material like pornography can also be accessibility-enhancing" (Op. at 19-20), this provides little comfort. The panel gave no indication of what those activities might be, or how to distinguish them from *non*-accessibility enhancing forms of content moderation. *Id.* Instead, without further explanation, the panel kicked the case to the "fact finder" to determine "whether the moderators' acts were merely accessibility-enhancing activities or whether instead their extensive, manual, and substantive activities went beyond the automatic and limited manual activities we have approved as accessibility-enhancing." Op. at 20-21.

Not only does this approach depart from the text of the statute, it fails to offer any meaningful guidance to courts or service providers about how to ensure that their content-review efforts remain on the right side of the panel's hazy new line. In contrast, reading the "at the direction of a user" language as written creates predictable outcomes that are easy to apply in concrete cases and that do not arbitrarily pe-

nalize providers for making good-faith efforts to filter out objectionable conduct.

*Second*, other provisions of the statute cut decisively against the panel's ruling. Where Congress wanted the DMCA to prevent service providers from having a role in selecting the material at issue, it said so expressly. Thus, one prerequisite for protection under the 512(a) safe harbor, which covers the *transmission* of content *across* a provider's network, is that the transmission is "carried out through an automatic technical process ***without selection of the material by the service provider***." 17 U.S.C. § 512(a)(2) (emphasis added). But no such limitation appears in Section 512(c). This contrast underscores that service providers may engage in some selection of the content that will ultimately be stored in response to users' requests without forfeiting that safe harbor. *Cf. id.* § 512(n) (providing that the different safe harbors are "separate and distinct"); § 512(k)(1) (adopting a more limited definition of "service provider" for the 512(a) safe harbor than for the 512(c) safe harbor).

The panel's distinction between "submitting" content and "posting" is similarly without any basis in the statute. Contrary to what the

panel suggested (Op. at 13), the submission of content to a service provider for storage is *not* covered by Section 512(a). That protection for "transitory digital network communications" permits, at most, immediate and transient copies, and it specifically excludes any scenario where a copy of the material "is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections." 17 U.S.C. § 512(a)(4); *accord Shelter Capital*, 718 F.3d at 1019 n.10. Instead, for services that actually host content, all the relevant processes reasonably related to storage are governed, and fully protected, by Section 512(c). That is the clear holding of *Shelter Capital*. 718 F.3d at 1018-20. And just as that protection cannot be artificially diluted to exclude the last step in that process (making content accessible to users), it cannot be read to omit the crucial first step—users submitting materials to providers for the purpose of making those materials publicly available. No prior decision has ever drawn that distinction.

*Third*, the panel overlooked the clear legislative history that speaks directly to the issue of content moderation. While DMCA protec-

tion does not require service providers to monitor user-submitted content (17 U.S.C. § 512(m)), the authoritative Conference Report is adamant that the statute was "***not intended to discourage the service provider from monitoring its service***." H.R. Rep. No. 105-796, at 73 (1998) (emphasis added). But that is exactly the result created by the panel's ruling, which reads the DMCA to create a powerful disincentive for service providers to monitor their services to prevent infringing or otherwise objectionable content from being posted.

This legislative history avoids an obvious absurdity, one that is now threatened by the panel's ruling. The whole point of the DMCA is to protect service providers from copyright claims so long as they meet the statute's minimum threshold. It makes no sense to deprive providers of that protection because they go above and beyond what the statute requires by making voluntary efforts to prevent potentially infringing items from appearing on their services in the first place. *Accord Capitol Records*, 826 F.3d at 98 (rejecting argument that Vimeo's "voluntary undertaking to monitor videos for infringement of visual material" deprived it of the safe harbor). In short, a service provider's efforts to

prevent copyright infringement should never be a basis for depriving it of the DMCA safe harbor.

But not only did Congress not want to discourage service providers from monitoring user uploads for *infringing* content, it wanted to encourage them to screen for other forms of unwanted content, including pornography, graphic violence, and spam. Shortly before the DMCA, Congress enacted Section 230 of the Communications Decency Act ("CDA"), which provides a broad "Protection for 'Good Samaritan' blocking and screening of offensive material." 47 U.S.C. § 230(c); *see also Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003) (explaining that one reason for "§ 230(c) was to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material"). It is unfathomable that these same service providers could face a loss of DMCA protection by engaging in the very kind of screening efforts that Congress intended to protect through this immunity. But that is what the panel's ruling seems to contemplate.

## II. THE PANEL'S RULING THREATENS VALUABLE PRE-SCREENING EFFORTS BY ONLINE SERVICES

Rehearing is warranted not merely because the panel's decision cannot be squared with the DMCA or this Court's prior decisions. If not

corrected, the ruling in this case is likely to have far-reaching consequences, threatening to deter service providers from engaging in many useful forms of content review. That result could needlessly degrade the quality of online services and make the Internet a less hospitable place for all.

Though not required by the DMCA, reviewing user-submitted material is a widespread practice among online service providers. In some instances, this review is done in connection with content already posted by users, often material that is "flagged" in one way or another as potentially problematic. The panel did not suggest, and rightfully so, that such review is inconsistent with DMCA protection. As in this case, however, some services find it useful to screen content *before* it becomes accessible on their systems. This can take various forms, from the human moderators used in connection with LiveJournal's service to sophisticated software programs that automatically scan user-submitted content while it is in the process of being uploaded.

These review efforts reflect the reality that some of the vast quantity of material submitted to online services may be objectionable for one reason or another. Prescreening can help ensure that what appears

on a given site is relevant to the site's purpose, consistent with its quality standards, and not illegal. It benefits users by keeping good content from being drowned out by pornography, graphic violence, and a wide range of other undesirable material, from gibberish spam, to online bullying and disinformation, to hateful terrorist propaganda. It reinforces that online services are *communities*, with standards about what can and cannot be posted. In short, content screening, while not legally required or universal, is a common practice that many online providers find useful to maintain their services as quality platforms for user speech and self-expression.

The panel's ruling in this case imperils that practice and its salutary effects. That decision seems to draw an artificial line between reviewing content that has already been posted and reviewing that content while it has been *submitted* for posting. This Court has rightly rejected that distinction in applying the similar CDA immunity. *See Batzel*, 333 F.3d at 1032 ("The scope of the immunity cannot turn on whether the publisher approaches the selection process as one of inclusion or removal, as the difference is one of method or degree, not substance."). Here, however, the way the panel applied the DMCA's "stor-

age at the direction of a user" and "right and ability to control" provisions creates profound uncertainty about whether (and when) service providers might lose protection under 512(c) based on their advance review of user submissions. While it is hard to believe that the panel intended to penalize service providers simply for making efforts to screen user submissions to stop undesirable content from being posted, its decision leaves services who screen content (or who may want to in the future) without any real guidance.

How is a provider supposed to know, for example, whether its content-review efforts are "merely accessibility-enhancing activities" (Op. at 20) or whether they involve the "something more" (Op. at 26) that the panel suggest might go beyond what the DMCA allows? Where is the line between the "automatic and limited manual activities" the panel seemed to approve and the "extensive, manual, and substantive activities" that it seemingly did not (Op. 20-21)? The panel did not say. Copyright plaintiffs can be counted on to use this confusion to try to broadly evict certain providers from DMCA protection merely because they use certain forms of prescreening.

That is an extremely worrying prospect. Any service faced with even the possible loss of the 512(c) safe harbor must proceed with great caution and care. The consequences of being on the wrong side of the DMCA line are severe. It means exposure to a potentially wide range of copyright claims based on the presence of third-party content with no protection from exorbitant statutory damages. And even if the provider guesses right, an immunity whose application is wholly indeterminate, or can only be asserted following a jury trial, offers no real protection at all. *Cf. Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc) (explaining that immunities must be applied so as to "protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles").

For these reasons, the panel's decision casts a pall over the existing activities of any number of online service providers. As a practical matter, providers are likely to respond to the panel's ruling by foregoing or significantly limiting advance review of user-submitted content. That would be a significant change, disrupting the beneficial screening efforts that many services now make in an effort to enforce their content

policies and prevent the posting of undesirable material. It may also retard the development of valuable new content-review techniques and technologies, which online services now may come to fear are too risky. The consequence of all this will be to make it more difficult for service providers to limit their users' exposure to a range of objectionable or unlawful content.

That benefits no one. It threatens to degrade the quality of online services, rendering them less hospitable environments and more likely to host content that copyright owners, users, or providers themselves find undesirable. It harms users who want to create and consume high-quality content. And it undermines the interests of copyright owners by thwarting efforts that providers might otherwise make to try to identify and block infringing material that users submit for posting. Simply put, the panel's decision threatens to bring about an outcome that would make things worse for everyone who is supposed to benefit from the DMCA. This is not remotely what Congress intended or prescribed. And rehearing should be granted to prevent it.

## CONCLUSION

The panel's decision represents a serious threat to the established DMCA regime and to valuable practices used by many leading online service providers. *Amici* urge the panel or the full Court to rehear this case and make clear to service providers who depend on the 512(c) safe harbor that their efforts to prevent copyright infringement and otherwise limit the posting of objectionable content will not deprive them of the vital protection that the DMCA promises.

Dated: May 15, 2017

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

By: s/ *Brian M. Willen*

Brian M. Willen
1301 Avenue of the Americas
40th Floor
New York, New York 10019
(212) 999-5800

*Counsel for Amici Curiae*

## APPENDIX A

## LIST AND DESCRIPTION OF *AMICI CURIAE*

1. **Facebook, Inc.**

Facebook, Inc. is one of the world's leading providers of online networking services, and is one of the most-trafficked websites in the world. Facebook provides a free Internet-based service that enables more than 1.9 billion monthly active users to connect with their friends and family, to discover what is going on in the world around them, and to share and publish the opinions, ideas, photos, and activities that matter to them and the people they care about.

2. **GitHub, Inc.**

GitHub, Inc. is a web-based platform that enables communities of users to collaboratively develop open-source software projects. GitHub hosts over 58 million projects and welcomes more than 21 million monthly visitors. GitHub-hosted software projects are often applications designed for computers or mobile devices, and they can also contain the material underpinning entire website deployments. GitHub is the Internet platform for Internet platforms — a one-stop shop where third parties can upload, store,

and perfect the next popular app or site. As such, GitHub has an interest in protecting its own platform as well as creating a thriving community for the new and valuable platforms that are frequently incubated through its services.

### 3. Google Inc.

Google Inc. is a leading Internet search engine and provides a wide range of other products and services—including email through its Gmail service, online video through YouTube.com, a blogging platform through Blogger, and social-networking tools—that empower people around the world to create, find, organize, and share information.

### 4. IAC/InterActiveCorp ("IAC")

IAC is a diversified online media company with more than 150 brands and products. IAC's businesses are leaders in numerous sectors of the Internet economy. Many of these businesses, including Match.com, Tinder, and Vimeo, provide users with the ability to post, search for, and view a wide variety of user-generated content. IAC's family of websites receive more than 2.5 billion visits each month from users in over 200 countries.

**5. Kickstarter, PBC**

Kickstarter is the world's largest funding community for creative projects — everything from films, games, and music to art, design and technology. Since its launch in 2009, 12.8 million people have pledged over $3 billion on Kickstarter, funding more than 124,000 creative projects. Kickstarter is a Public Benefit Corporation based in Brooklyn.

**6. Patreon, Inc.**

Patreon, Inc. is a membership platform that makes it easy for artists and creators to get paid. Content creators such as artists, writers, podcasters, musicians, photographers and video makers can use Patreon's platform to send rewards and receive subscription payments from their patrons. Patreon has sent over $100 million to creators.

**7. Pinterest, Inc.**

Pinterest is an online catalog of ideas. Every month, over 175 million people around the world use Pinterest to find and save ideas for cooking, parenting, style, and more.

**8. The Computer & Communications Industry Association ("CCIA")**

The CCIA represents over twenty companies of all sizes providing high technology products and services, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services – companies that collectively generate more than $540 billion in annual revenues.[1]

**9. The Internet Association**

The Internet Association, the unified voice of the internet economy, represents the interests of over 40 leading internet companies. It is dedicated to advancing public policy solutions that strengthen and protect internet freedom, foster innovation and economic growth, and empower users.

[1] A list of CCIA members is available at https://www.ccianet.org/members.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(2) because it contains 3,530 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: May 15, 2017

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI, P.C.

By: s/ *Brian M. Willen*

Brian M. Willen
1301 Avenue of the Americas
40th Floor
New York, New York 10019
(212) 999-5800

*Counsel for Amici Curiae*

9th Circuit Case Number(s) 14-56596

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*********************************************************************************************

CERTIFICATE OF SERVICE
When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) May 15, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) /s Brian M. Willen

*********************************************************************************************

CERTIFICATE OF SERVICE
When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)